**Catherine JONES, Plaintiff-Appellant,**

v.

**FLORIDA POWER CORPORATION,
and Arthur Leigh,
Defendants-Appellees.**

No. 86–3421.

United States Court of Appeals,
Eleventh Circuit.

Aug. 27, 1987.

---

Nelson, Beckett & Nelson, Gardner W. Beckett, St. Petersburg, Fla., for plaintiff-appellant.

J. Lewis Sapp, Atlanta, Ga., for defendants-appellees.

Before JOHNSON and CLARK, Circuit Judges, and MORGAN, Senior Circuit Judge

MORGAN, Senior Circuit Judge:

Appellant, Catherine Jones, an employee with the Florida Power Corporation, appeals the lower court's finding that she was not the victim of racial discrimination when the appellee, Florida Power, cancelled the position she had applied for. More specifically, she claims that the trial court was clearly erroneous in its findings of fact that there was no prejudice involved in either her conversation with Arthur Leigh, a manager at Florida Power, or the actual cancellation of the promotion opportunity for all applicants. She also alleges that the court erred in refusing to allow evidence concerning possible retaliation against appellant by other company employees after she filed her complaint. After a review of the record in this case, we affirm the lower court's decision.

## I. FACTUAL BACKGROUND

In the early spring of 1982, the management of the production area at the Florida Power Corporation received authorization to create and fill a job position titled System Maintenance Crew Field Office Administrator (FOA). The holder of this position would be responsible for the selection and hiring of temporary craft labor at the plant, and for the management of all records, files, administration and equipment areas. The position required that applicants have: a high school degree, seven years experience in accounting and administrative duties, the ability to travel on an unscheduled basis, and the ability to work closely with the personnel department and supervisors plus the ability to select skilled and competent employees. The appellant, a black female, considered applying for the job. There were six other applicants, all of whom were white. Appellant informed co-defendant, Arthur Leigh, the manager of maintenance services at Florida Power Corporation, of her interest in the new job and asked if there was still time to turn in an application. Mr. Leigh said she could apply for the job. About a half hour later, Mr. Leigh passed by appellant's desk and asked her to come into his office. Once inside his office, Mr. Leigh spent approximately one and one-half hours attempting to talk the appellant out of applying for the job. At trial, both the appellant and Leigh testified concerning their conversation. Both accounts differ greatly. Appellant testified that Leigh said she was not qualified for the job since there "was a lot of red necks [sic] working on the crew," and that she "did not have the right rapport to work with the type [of] people that worked on the crew." [R. 3–37]. She also testified that when she told him she would pray to God that he would change his mind, he replied, "are you going to put a mojo on me?" [R. 3–38]. On cross-examination, appellant stated that the word "mojo" connoted a black voodoo curse and that it was most commonly used by black people. [R. 3–69]. Finally, appellant testified that Leigh never specifically mentioned her race during their conversation although she felt that the thrust of his comments was that her race would make her ill-suited to get along with the white members of the crew.

Arthur Leigh took the stand and testified that he often called employees in to tell them that he thought they were applying for jobs for which they were unqualified. Although he stated that he had done this in the past, he admitted that he did not question any other applicants for this particular job. Next, he stated that he told appellant that she was unqualified since she had no understanding of their union contract, and that she had no experience with the actual workings within the plant.[1] Finally, he testified that he had never heard the word "mojo" nor used the word "red-neck." [R. 3-95]. Leigh emphasized that it was the appellant who continually made references to her race, and that he told her she could still apply if she wanted to.

The next day, appellant went to see Dorothy Wertz, a fellow black employee who worked in the company's equal employment opportunity program (EEO). Wertz told appellant that until she actually filed her application and received a rejection, she had no cause of action. During their conversation, there was no mention of race, and appellant's main concern was that Leigh was exhibiting favoritism to a specific employee, Stella Ames. After her conversation with Wertz, appellant applied for the job. Appellant testified that when her immediate supervisor, Sally Crockett, received her application, she told appellant that she would not recommend her since she would not be able to get along with the crew. Appellant testified that Ms. Crockett stated that there would be friction between appellant and the crew because appellant was black. Ms. Crockett was not present to testify.

Several days later, the company posted a notice that they had cancelled the new position. The reason stated was that "the subject position's duties and responsibilities as posted need[ed] revision in order to compliment the future crew organization needs." (Plaintiff's Exhibit No. 7). Leigh testified that the actual reason for the cancellation was that a hiring freeze became effective after the FOA position was approved. Therefore, filling this new position would mean cutting back on new employees in other areas. Leigh stated that after he learned about this situation from Lloyd O'Steen (a Florida Power welding mechanic and chief union steward for Local 433 from Englis), he decided it was necessary to cancel the FOA position. One year later, the position of Labor Resources Manager was created. Although the position's duties were somewhat similar to the FOA position, the skill requirements had been increased to include a bachelor's degree in engineering and ten-years' experience in power plant instruction, maintenance or operations with at least five years of supervisory experience, and extensive knowledge of plant maintenance and the union contract. Appellant had none of these additional qualifications.

Subsequently, appellant filed a complaint with the St. Petersburg Human Relations Department. After receiving written statements from all parties, the department issued a decision stating that racial discrimination was the central reason for cancelling the FOA position. (Plaintiff's Exh. 10, p. 8).

Appellant then brought suit against the Florida Power Company and Arthur Leigh challenging their alleged discriminatory denial of a promotional opportunity. The suit was instituted pursuant to Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 1981. After hearing testimony from both sides, the lower court made several findings of fact. The court found that appellant's testimony concerning her discussion with Arthur Leigh was not credible. In particular, the court believed Arthur Leigh's testimony that there was never any mention of "mojo" curses or "rednecks." The court buttressed this decision with Dorothy Wertz's testimony that appel-

---

1. Appellant pointed out at trial that these qualifications were not listed as prerequisites for the new position.

lant did not mention racial discrimination when she visited Wertz the day after her conversation with Leigh. Finally, the court relied on uncontested evidence that it was Leigh's common practice to talk employees out of applying for jobs for which he felt they were unqualified.

Concerning the job cancellation issue, the lower court found the testimony that the management was operating under a recently imposed and unexpected hiring freeze both credible and convincing.

In accordance with these findings of fact, the lower court granted judgment for the defendants.

## II. THE FINDINGS OF FACT

The lower court relied on two basic findings of fact in its decision to grant judgment to appellees. First, the court found that co-defendant Leigh's version of his conversation with appellant was more credible than appellant's version. Second, the court found that the hiring freeze was a legitimate reason for cancelling the new FOA position. These decisions were both findings of fact in that they both were based on "the fact-finding tribunal's experience with the mainsprings of human conduct to the totality of the facts of each case." *Commissioner v. Duberstein*, 363 U.S. 278, 289, 80 S.Ct. 1190, 1198, 4 L.Ed.2d 1218 (1960). Under Fed.R.Civ.P. 52(a), the reviewing court may only set aside findings of fact when they are "clearly erroneous." Early cases held that a finding of fact was clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). A later decision helped to clarify this standard by holding that if the lower court chose between two permissible interpretations of the evidence, its decision is not clearly erroneous. *United States v. Yellow Cab Co.*, 338 U.S. 338, 342, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949). More recently, the Su-

preme Court held that "[i]f the district court's account of the evidence is *plausible* in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985) (emphasis added). With this standard in mind, we must now examine each of the lower court's findings.

### A. The Conversation

■ The first finding of fact that the lower court made was that appellant was not discriminated against during her conversation with Arthur Leigh. Although both parties agree that Leigh did attempt to dissuade appellant from applying for the job, they disagree on whether appellant's race was the motivating factor behind Leigh's actions. Therefore, it was left to the trial court to judge the credibility between the two witnesses. The court believed Leigh's testimony. It heard uncontroverted testimony from both parties that Leigh had previously advised other applicants not to apply for positions they were unqualified for. (R. 3–72, 96, 97). More importantly, the court found that the appellant's testimony was not credible. The court refused to believe that Leigh constantly referred to her working with "rednecks" or that he was concerned that she would put the "mojo" on him. More importantly, the court found that Leigh's account of the conversation was buttressed by the fact that appellant failed to mention any racial discrimination when she expressed her concerns to Dorothy Wertz, the EEO specialist. (R. 3–168).

When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.

*Anderson,* 470 U.S. at 575, 105 S.Ct. at 1512. After viewing the evidence concerning the conversation with "great deference," it is clear that the court's ruling was not clearly erroneous.

### B. *The Job Cancellation*

The lower court also found that Florida Power's cancellation of the FOA position was not the result of racial discrimination but was justified due to a company hiring freeze. The record shows that there was a hiring freeze ordered by the president of Florida Power in June 1982. (R. 3-85). Florida Power had approved the creation of the FOA position around May of that year. Leigh testified that he and the actual hiring manager, Arthur Ball, decided that filling the FOA position would abolish another more important union position.[2] Therefore, they agreed that they would cancel the FOA position, and that Mr. Ball would notify each of the seven applicants for the position.

The appellant claims that this story is not credible because the notice she received gave a different reason for eliminating the FOA position. The notice only stated that the position's duties and responsibilities needed revision. However, Leigh testified that he and Ball had decided

> that it wasn't necessary to put in that letter all the little details [of why we were] doing this because of the union or ... because we don't want to abolish any jobs. I asked him to write a letter that was more general in nature simply stating that we were abolishing the job for management decisions, basically.

(R. 3-104).

The appellant also argued that the new position offered on July 5, 1983 (Labor Resources Manager) had the same duties

as the FOA position but required higher qualifications (a college degree) in an attempt to keep her from getting the job. This is an incorrect assertion as the new position supervised many more people and controlled a much larger financial budget.

Although we are not totally convinced that there was no racial discrimination involved, the district court did rely on "plausible" evidence in light of the record viewed in its entirety. On this basis, the lower court's findings of fact must be affirmed.

### III. EVIDENCE OF RETALIATION

Appellant also claims that the lower court abused its discretion by ruling that appellant could introduce no evidence of later reprisal or retaliation by the company against her after she filed her complaint of discrimination against it. Appellant argues that this evidence is relevant in that it "tended to establish a pattern or scheme to discriminate on the basis of race." (Appellant's brief p. 38). There was no abuse of discretion by the lower court since appellant's original complaint never alleged any pattern of discriminatory conduct. She only alleged that she was denied the FOA promotion because she is black.

Evidence of other acts by the appellees would be admissible to show motive or intent, but would not be admissible to prove that appellees acted in conformity with further discrimination against appellant. Fed.R.Evid. 404(b). There is no need to consider this question, however, since appellant admitted at trial that proving intent to discriminate was not her purpose in introducing evidence that appellees retaliated against her after she filed her discrimination complaint.[3] After appellant agreed that the purpose of introducing evidence of

---

**2.** The union workers were the hands on workers who made repairs around the plant. Leigh testified that he and Ball (upon the advice of O'Steen, the union steward) felt that they could get by with their number of personnel in the office, but they needed extra positions in the labor force or union jobs. (R. 3-104).

**3.** When the issue of this evidence's relevancy arose, the following colloquy took place:
> THE COURT: Well, it will take some bit of discernment and discretion on your [appellant's] part to separate out those portions of that area of inquiry that would reflect on a retaliation type claim as opposed to one which simply projects from a damages point

her post-complaint treatment by appellees was solely to measure damages, the court allowed some of this evidence into the record. After concurring with the court's decision, appellant cannot now claim any judicial abuse of discretion.

## IV. CONCLUSION

After a review of the entire record, it is evident that there is a plausible basis for the lower court's decision that appellant was not the victim of racial discrimination. Therefore, we are not of a firm and definite conviction that the lower court was clearly erroneous. Accordingly, the district court's decision is AFFIRMED.

of view, the plaintiff's posture. The projection of the defendant's earnings from the time of the alleged discrimination to date is relevant to the damages claim. But the details and the implication of a retaliatory approach by the defendant are not relevant in the light of the posture of the pleadings in this case.

APPELLANT'S COUNSEL: I agree with that, Your Honor.

