George McGINEST, Plaintiff–Appellant,

v.

GTE SERVICE CORP.; Mike Biggs, Defendants–Appellees.

No. 01–57065.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 2, 2002.

Filed March 11, 2004.

David A. Cohn, Mancini & Associates, Encino, CA; Gerald M. Serlin, Benedon &

Serlin, Woodland Hills, CA, for the plaintiff-appellant.

Jennifer L. Nutter and Thomas P. Brown IV, Epstein, Becker & Green, Los Angeles, CA, for the defendant-appellee.

Before: REINHARDT, O'SCANNLAIN, and PAEZ, Circuit Judges.

PAEZ, Circuit Judge:

George McGinest, an African–American employee of GTE Service Corporation ("GTE"), sued GTE under Title VII for creation of a racially hostile work environment, failure to promote due to racial discrimination, and failure to promote due to retaliation. McGinest claims that GTE created a racially hostile work environment based both upon its perpetration of and its failure to adequately respond to a large number of incidents that occurred over a fifteen year period. In support of his hostile work environment claim, McGinest alleges that he was placed in dangerous working conditions because of his race, prevented from collecting bonus pay available to non-African American coworkers, forced to endure racial taunts and insults by supervisors and coworkers, and subjected to racist graffiti in GTE's bathrooms and on switch boxes. Additionally, McGinest claims that he was denied a promotion in late 1998 due to his race and in retaliation for filing an EEOC complaint; GTE responds that it was unable to promote him due to a hiring freeze.

The district court granted summary judgment to GTE. The court found that the incidents comprising the hostile work

environment claim were sporadic, and for the most part adequately remedied. Moreover, it found that McGinest was unable to produce sufficient evidence that GTE's stated reason for failing to promote him was a pretext.

We reverse the district court's dismissal of the hostile environment and disparate treatment claims. The district court resolved numerous factual questions in favor of GTE, failed to distinguish between supervisors and coworkers in evaluating GTE's liability, and did not consider fully the cumulative impact of the events that occurred. Because McGinest has established genuine material issues of fact regarding his hostile work environment claim, as well as on the question of whether the denial of the promotion was prompted by a discriminatory motive, these claims must be remanded. However, McGinest has failed to establish a prima facie case of retaliation, and so we affirm the district court's dismissal of this claim.

# I.

# BACKGROUND

George McGinest is an African–American employee of GTE, a telecommunications company.[1] He has worked for GTE for 23 years, and has continued to do so during the course of this litigation. McGinest was initially hired as a lineman, and subsequently has worked as an outside plant construction worker and relief supervisor. At the GTE facilities at which McGinest has worked, he has been one of few African–American employees. Because this case was decided on summary judgment, we evaluate the facts in the light most favorable to McGinest, the non-

moving party. *Lam v. Univ. of Hawaii*, 40 F.3d 1551, 1555 n. 2 (9th Cir.1994).

## A. Hostile Work Environment

McGinest describes a number of events and practices, which he alleges cumulatively created a hostile work environment. These events fall roughly into two categories: some involved discriminatory treatment through concrete actions, while others involved written and oral derogatory statements.

### 1. *Concrete Actions*

*Events Involving Supervisor Jim Noson*

Jim Noson supervised McGinest for five or six years, at a facility in Long Beach, ending in the early 1990s. During this time, Noson engaged in numerous acts of racial harassment directed toward McGinest. Although the majority of these incidents were not accompanied by explicit racial comments, McGinest testified at his deposition that Noson's behavior and "any comment that he made was because of my race." According to McGinest, Noson forced McGinest to work under dangerous conditions or without proper equipment, and subjected him to obscene and demeaning language. When McGinest was responsible for a project, Noson would not provide him with sufficient crew members to safely perform the job. Noson also indicated his desire to fire McGinest on several occasions, and specifically stated that he wished to provoke McGinest into fighting with another worker so that he could fire both of them. On one occasion, Noson noted that McGinest was wearing a gold chain, and commented "only drug dealers can afford nice gold chains."

---

1. Although GTE is now owned by Verizon, we continue to refer to it by the name under which it was sued.

Noson's abusive conduct was also aimed at Matt Ketchum, a white coworker and friend of McGinest. McGinest testified that although Ketchum "received the blunt of the problem too, it still was directed to me because of my race .... 90 percent of time, if he wasn't [ ] with me, he wouldn't receive the same bashing."

Any time that McGinest had a problem with Noson he gave notes complaining about Noson's conduct to his supervisor, Hank Bisnar, and complained in person. Because McGinest's complaints were not successful in remedying the problem, McGinest ultimately filed an internal discrimination complaint noting twelve incidents where Noson had treated him in a discriminatory manner. GTE claims that it conducted an internal investigation, finding Noson's comments to be merely "shop-talk," but requiring Noson to apologize to McGinest. However, McGinest states that he never received a response to his complaint.

*Overtime for Relief Supervisors*

From 1995 to 1997, non-African-American relief supervisors received overtime pay when they arrived early to set up for their shift. On some occasions, relief supervisors were permitted to claim an entire hour of overtime when they arrived just five minutes early to set up for their shift. GTE acknowledges that until the arrival of the new manager, Mike Begg, there was an unwritten rule that relief supervisors got an hour of overtime for each shift. McGinest testified that even after Begg's arrival, some supervisors continued to get "bonus" overtime pay, however, McGinest's supervisor, Don Roberts, refused to allow him to claim any of the overtime that he actually worked when he was a relief supervisor. McGinest challenged this differential treatment for several paychecks, submitting timesheets that reflected the overtime that he worked, only to have the overtime removed by Roberts. McGinest complained repeatedly about this treatment.

*Coworkers' Refusal to Obey When McGinest Was Relief Supervisor*

In 1995, McGinest moved from the Long Beach facility to Huntington Beach. Upon his arrival, he had difficulties with coworkers who refused to work under his supervision when he was the relief supervisor. On one occasion, several workers refused to work for him in carrying out a job that was extremely dirty and undesirable. Brian Brand, a white coworker, testified that they also refused to work for him on the same occasion. McGinest did not complain to management about this incident.

*Maintenance of Vehicles*

In March of 1997 McGinest became concerned that one of the tires on his company vehicle was wearing out. Since ninety percent of his driving time was on the freeway, he was concerned for his safety. He sent a request in writing to the garage to have the tire replaced, but the garage mechanic replied that there was nothing wrong with the tire. He also informed his supervisor, Don Roberts, about the need to replace the tire, but Roberts said that "the company wouldn't spend any money on any tires." After McGinest's request for repair was denied, he showed the tire to another supervisor, who agreed that the tire looked bald.

Two to three weeks after these events, the tire blew out while McGinest was driving the vehicle and he crashed into a wall. McGinest was treated for injuries at the hospital. His leg was injured and he had to wear a neck brace.

McGinest testified that almost everyone was driving around in vehicles with better tires. He explained that when white employees "want[ ] something fixed, they get it," and cited an example of a white em-

ployee who had requested new tires around the same time that McGinest had, but who had obtained them. Another co-worker, Brand, agreed that the garage mechanic and the foreman seemed to have a particular problem with three black employees, one of whom was McGinest, noting that they "continuously treated George [McGinest] in a de[ ]meaning and[condescending] manner in my presence." Brand testified that "[f]or the most part they seemed to be pretty good with myself, and [others] . . . we happen to be white, it could have been racial. It could have been just personality."

## 2. Racial Slurs and Derogatory Comments

*Derogatory Statement by Coordinator Tom Hughes*

In May 1996, Tom Hughes called McGinest "stupid nigger" to his face, an epithet that was overheard by Brand. Hughes had referred to McGinest on other occasions as "stupid" and "sparrow brain," and had told McGinest, "you should stay in Long Beach where you belong, with your kind."

McGinest did not report the May 1996 incident immediately because he was so enraged that he had to leave the building. The next day, McGinest reported to his immediate supervisor, Gary Deason, that Hughes was "always calling me a name." However, he did not pursue a formal complaint with the management because of his conviction that it would be futile, "because

I went to management with several different things and nothing changed, over and over again."

Rather, McGinest filed a complaint with the EEOC. Upon receiving a call from the EEOC in July 1997, human resources manager Jeff Nakamura began an investigation of the incident. Nakamura found Hughes's denial that this comment occurred plausible. Based on this belief and the EEOC's refusal to provide him with the name of the witness, Nakamura did not pursue the investigation. Nakamura testified that he waited two years to reinitiate the investigation "because in the meantime I thought the agency would be cooperative by sharing with me the name of the witness so I could do a thorough investigation." Once Nakamura did reopen the investigation, he learned the name of the witness by interviewing several employees. After Brand, the witness, confirmed that the epithet had been used, Nakamura determined that disciplinary action should be taken despite Hughes's continued denial. Hughes was counseled against using such words, shown a video on *sexual* harassment, and received a disciplinary memo.[2] There is no allegation that Hughes engaged in any further objectionable conduct following this discipline.

*Comment by Supervisor Ledbetter*

McGinest and Brand testified that in January 1997 Paul Ledbetter, a supervisor, was frustrated that McGinest and his crew were not able to perform a work

2. The memorandum read in full:
On June 15, 1999, an investigation was held with you regarding a racial statement you supposedly made to another employee.
Upon the conclusion of this investigation, which showed your failure to adhere to Company policy, I have no alternative but to issue this disciplinary memorandum.
You will be reviewed on the Company's policy regarding GTE's Equal Employment Opportu-

nity, Affirmative Action and Workforce Diversity. Any further violations of this nature could result in your termination from GTE Network Services.
This disciplinary memorandum will be removed if you have no further violations for a period of one year.
I am confident that you will succeed in your efforts. If I can be of any assistance, please feel free to see me.

assignment immediately. They quoted him as saying, "The other colored guy who used to work here would jump when I said it. It is a damn shame how it's gone downhill." McGinest reported this incident to management. GTE claims that Ledbetter no longer worked at GTE in 1997.

*Comments by Coworkers*

On one occasion, coworker Alex Talmadge said, referring to McGinest, "I'll retire before I work for a Black man." Another coworker, Jim Frick, said of McGinest, "I refuse to work for that dumb son of a bitch." McGinest complained about these incidents to Roberts and Begg.

In 1996 and 1997, McGinest's coworker Daniel DeLeon called Ketchum "Aunt Jemima" numerous times in the presence of McGinest. DeLeon also referred to McGinest as Ketchum's "mammy" on a number of occasions. McGinest and a black coworker note that the phrase "Aunt Jemima" is a racial insult, connoting laziness and servitude. Although Ketchum is white, McGinest explained that the comment was intended to irk McGinest, and was directed at Ketchum because he is friends with black employees.

McGinest requested that DeLeon not use this phrase because he found it racist, but was told "fuck you" in response. McGinest reported the comment both to manager Mike Begg and to supervisor Roberts, who supervised McGinest and DeLeon, but was unaware if any disciplinary action was taken. Human resources manager Nakamura was apparently un-

aware of this incident until the phone call from the EEOC representative. Following the call, Nakamura questioned DeLeon. DeLeon claimed that he did not intend "Aunt Jemima" as a racial insult, but rather as a teasing nickname referring to a commercial that emphasized the slowness with which the syrup poured out of the bottle. Ketchum also apparently had a nickname for DeLeon, "Biscuit." Nakamura testified that he found DeLeon's explanation plausible, but nonetheless instructed DeLeon to stop using the phrase.[3] There is no allegation that DeLeon continued to use the phrase subsequently.

*Racist Graffiti*

McGinest saw racist graffiti on the walls of the men's restroom and in the stalls on multiple occasions. This graffiti included the word "nigger," sometimes altered to "digger," and the phrase "white is right." Other coworkers testified to seeing the phrase "PONTIAC," meaning "poor old nigger thinks it's a Cadillac,"[4] and, in December 2000, "nigger go home." Although managers used the same restrooms, the graffiti was not painted over when it appeared and no public action of disapproval was taken.

Similar racist graffiti, particularly the word "nigger," also was present in GTE switch boxes and in the blockhouse and garage. A coworker noted that one year during Black History Month the word "Black" was crossed out on a poster and "nigger" was written in its place. The defaced poster displayed this epithet until

---

3. GTE notes that DeLeon is originally from Cuba, and hence may have been unaware that this phrase is a racial insult, although he has been in the United States for over 20 years. DeLeon's explanation is somewhat less believable in light of his uncontested use of the clearly racial phrase "mammy." Moreover, McGinest testified that DeLeon was "a very

intelligent person, and he ... understood exactly what he was saying, and he was being racist."

4. Leigh Washington, the African–American coworker who reported seeing this phrase, stated that he complained for weeks before GTE painted it over.

the coworker finally removed it three weeks later.

McGinest only mentioned this graffiti to management on one occasion, around April 1998. On this occasion, McGinest and a coworker reported to Al Valle that the word "nigger" had appeared in the bathroom, and Valle promptly spray-painted over it. Later, when supervisor Roberts learned about the incident, he said, "Oh well, I guess I'll have to write it again," and then added, "Ah, why can't we all just get along," in reference to a statement made by Rodney King after being beaten by Los Angeles police officers. Roberts may not have been aware of the precise nature of the graffiti at the time of these comments, as there is testimony that he was merely told that it was condescending.

Following this event McGinest "basically stopped using this bathroom ... because I am offended and disgusted with seeing the "N" word written in the bathroom—I would get upset if I were to see it written." The word "nigger" and other racist graffiti have continued to appear in the bathroom since this incident.

*Antidiscrimination Policy*

Although GTE claims that it has a "zero tolerance" policy for discriminatory conduct, its written policy, which appears to have been adopted in 1997, says nothing about zero tolerance or about any ramifications for such conduct. Nor does the written policy detail what steps an employee should follow if the employee feels she or he has been subjected to discriminatory conduct, stating only, "If you have questions concerning equal employment opportunity, discrimination, or affirmative action, discuss them with your supervisor or human resources representative."

**B. Failure to Promote**

In September 1998, GTE had a vacancy in the position of Outside Plant Construc-

tion Installer Supervisor. McGinest applied for this position, which would have been a promotion. He passed the qualifying exam and was interviewed for the position by Begg in October 1998.

According to GTE, McGinest was selected for the position, but when Begg contacted the human resources department to obtain salary authorization he was informed by Casey Larson that there was a salary/hiring freeze in place. Nakamura testified that the salary freeze was due to GTE's financial difficulties. Consequently, another employee, John Phalen, was moved laterally into the position.

However, GTE was unable to produce any documentation verifying that there was a salary freeze, and Phalen himself testified that he was unaware that there was a freeze, despite the fact that it was allegedly the reason for his transfer. GTE claims that it is common for salary freezes to be implemented without written notification. The record does not reflect how large an operation GTE was at this time, but at least 175 individuals were employed in the three yards supervised by Begg.

The decision not to promote McGinest occurred approximately a year and a half after McGinest filed his EEOC complaint. McGinest notes that African Americans are underrepresented at GTE, particularly in supervisory positions, and claims that it is difficult for African Americans to advance. In the Huntington Beach yard, where McGinest worked, five or six out of 70 employees were African American, and none were supervisors.

McGinest initially filed a complaint with the EEOC on June 3, 1997. After conducting an investigation, the EEOC determined that the evidence supported a finding that "respondent acted in violation of Title VII of the Civil Rights Act of 1964." McGinest filed an additional complaint re-

garding the failure to promote. After the EEOC issued a Right to Sue notice, McGinest sued GTE and supervisor Mike Begg. The district court granted summary judgment to the defendants as to all claims. McGinest timely appealed the judgment for GTE, but did not appeal the district court's dismissal of his claim against Begg.

## II.

## DISCUSSION

McGinest alleges that GTE's actions violated his right to be free from invidious discrimination in the workplace. He raises three separate Title VII claims: 1) creation of a racially hostile work environment; 2) failure to promote on account of race; and 3) failure to promote on account of retaliation. We review *de novo* the district court's grant of a motion for summary judgment. *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1408 (9th Cir. 1996).

In evaluating motions for summary judgment in the context of employment discrimination, we have emphasized the importance of zealously guarding an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses. *See, e.g., Schnidrig*, 80 F.3d at 1410–11; *Lam*, 40 F.3d at 1563; *Sischo–Nownejad v. Merced Community College Dist.*, 934 F.2d 1104, 1111 (9th Cir.1991). As the Supreme Court has stated, "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 81–82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). As a result,

when a court too readily grants summary judgment, it runs the risk of providing a protective shield for discriminatory behavior that our society has determined must be extirpated.

## III.

## HOSTILE WORK ENVIRONMENT

Under Title VII of the Civil Rights Act of 1964, it is "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e–2(a)(1) (2003). This prohibition encompasses the creation of a hostile work environment, which violates Title VII's guarantee of "the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). "Courts have long recognized that a workplace in which racial hostility is pervasive constitutes a form of discrimination." *Woods v. Graphic Communications*, 925 F.2d 1195, 1200 (9th Cir. 1991).

In order to survive summary judgment, McGinest must show the existence of a genuine factual dispute as to 1) whether a reasonable African–American man would find the workplace so objectively and subjectively racially hostile as to create an abusive working environment; and 2) whether GTE failed to take adequate remedial and disciplinary action. *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1462–63 (9th Cir.1994); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

### A. Severe or Pervasive Hostile Environment

In determining if an environment is so hostile as to violate Title VII, we

consider whether, in light of "all the circumstances," *Nichols v. Azteca Rest. Enter.*, 256 F.3d 864, 872 (9th Cir.2001), the harassment is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Meritor*, 477 U.S. at 67, 106 S.Ct. 2399 (internal brackets and quotation marks removed). The Supreme Court has followed a "middle path" with regard to the level of hostility or abuse necessary to establish a hostile work environment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Simply causing an employee offense based on an isolated comment is not sufficient to create actionable harassment under Title VII. *Id.* However, the harassment need not cause diagnosed psychological injury. *Id.* at 22, 114 S.Ct. 367. It is enough "if such hostile conduct pollutes the victim's workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position." *Steiner*, 25 F.3d at 1463.

■ A plaintiff must show that the work environment was both subjectively and objectively hostile. *Nichols*, 256 F.3d at 871–72. Subjective hostility is clearly established in the instant case through McGinest's unrebutted testimony and his complaints to supervisors and to the EEOC. *Id.* at 873.

■■ In evaluating the objective hostility of a work environment, the factors to be considered include the "frequency of discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Nichols*, 256 F.3d at 872 (quoting *Harris v. Forklift Sys.*, 510 U.S. at 23, 114 S.Ct. 367). "The required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct." *Id.* (internal quotation marks omitted). Considering the facts in the light most favorable to McGinest,[5] it is clear that the

---

5. GTE contests McGinest's version of the facts. However, it is axiomatic that disputes about material facts and credibility determinations must be resolved at trial, not on summary judgment. *See, e.g., Lam*, 40 F.3d at 1559. Indeed, the Supreme Court has instructed that at the summary judgment stage, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The district court, contrary to these fundamental principles, accepted GTE's allegations that many of the events attested to by McGinest either did not occur as McGinest described or were not racially motivated. For example, although McGinest and others testified that the garage foreperson treated black employees worse than white employees, the district court emphasized one deponent's acknowledgment that the foreperson's animus against the black employees may have been due simply to personality. Similarly, the district court concluded that "there is no credible evidence of a differential application of any 'unwritten rule'

regarding relief supervisor overtime." However, in both of these instances McGinest provided detailed deposition testimony describing his personal observations regarding the manner in which African–American employees were disfavored in relation to white employees. This testimony did not consist of mere "conclusory allegations," which would be insufficient to defeat a motion for summary judgment. *Nat'l Steel Corp. v. Golden Eagle Ins. Co.*, 121 F.3d 496, 502 (9th Cir. 1997). Rather, McGinest's testimony would suffice to enable a reasonable trier of fact to conclude that discrimination had occurred, without the need for further corroborating evidence. *See United States v. One Parcel of Real Prop.*, 904 F.2d 487, 491–92 (9th Cir. 1990). At trial, the trier of fact might deem such testimony to lack credibility, and disregard it. However, when ruling on a summary judgment motion, the district court is not empowered to make credibility determinations or weigh conflicting evidence. *Liberty Lobby, Inc.*, 477 U.S. at 255, 106 S.Ct. 2505; *see also SEC v. Koracorp Indus., Inc.*, 575 F.2d 692, 699 (9th Cir.1978).

incidents described are sufficient to survive a motion for summary judgment. According to McGinest, he was involved in a serious automobile accident because, due to his race, both his supervisor and garage personnel were unwilling to ensure that his vehicle received necessary maintenance. He was forced to work in dangerous situations and barraged with insults and abuse by, among others, Supervisor Noson.[6] Over a two-year period, he was prevented from collecting overtime pay that he worked.[7] McGinest's ability to

**6.** Whether the allegations regarding Noson are admissible at trial *for purposes of liability* is a close question. The principal case on this issue is *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002); a case the district court did not have the benefit of when it issued its summary judgment ruling.

In *Morgan*, the Court held that "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." 536 U.S. 101, 105, 122 S.Ct. 2061, 153 L.Ed.2d 106. As the *dissent points out*, *Morgan* itself does not offer precise guidance on how to evaluate whether an act that falls outside the statutory time period can nonetheless be considered for liability purposes. Dissent Op. at 1127, n. 2. *Morgan* implies that a previous incident would not be part of the same hostile work environment claim, and therefore time-barred, if it "had no relation to" the later acts, or there was intervening action taken by the employer. 536 U.S. at 118, 122 S.Ct. 2061. Additionally, allegations that would ordinarily be time-barred, but are nonetheless part of a single hostile work environment claim, are still subject to the equitable defenses of waiver, estoppel, and equitable tolling. *Id.* at 121, 122 S.Ct. 2061.

Here, viewing the evidence in the light most favorable to McGinest, it is possible that the events concerning Noson in the early 1990s are "part of one unlawful employment practice" giving rise to a "single claim." *Id.* at 118, 122 S.Ct. 2061. Noson's harassment spanned several years ending in the early 1990s, involving, among other things, a thinly-veiled racially derogatory comment. While the dissent places reliance on the fact that GTE did ask Noson to apologize to McGinest, GTE's unsatisfactory response is evidenced by the fact that it considered Noson's comments and behavior to be merely "shoptalk"—undermining any claim that GTE viewed this as a serious problem.

However, as noted before, neither the district court nor the parties had the benefit of the Supreme Court's decision in *Morgan*. As a result, the record is under-developed in this regard. Therefore, upon remand the district court may decide in the first instance whether, under *Morgan*, the allegations regarding Noson are sufficiently related such that they can be considered for purposes of liability and, if so, whether they should nonetheless be equitably barred. We note that even if the Noson allegations cannot be considered for purposes of liability, they nonetheless may still be admissible at trial for other limited purposes. As *Morgan* notes in the context of discrete discriminatory acts, the statute does not "bar an employee from using the prior [untimely] acts as background evidence in support of a timely claim." 536 U.S. at 113, 122 S.Ct. 2061; *see also Lyons v. England*, 307 F.3d 1092, 1108 (9th Cir.2002) (holding that under *Morgan* "appellants are permitted to offer evidence of the pre-limitations discriminatory detail assignment scheme in the prosecution of their timely claims"). The dissent itself reaches the conclusion that McGinest's hostile work environment claim survives summary judgment and thus, even on the dissent's own terms, it would be premature to limit the type of evidence McGinest can present at trial in support of his hostile work environment claim. Indeed, the dissent appears to suggest that the Noson allegations could not even be considered as background evidence to McGinest's hostile work environment claim. *See* Dissent Op. at 1127–28. Not only would this position run contrary to our precedent in *Lyons*, but it also would supplant the district court's role under Federal Rule of Civil Procedure 16 to fashion a pretrial order that would govern the course of the trial by preemptively purporting to exclude potentially admissible evidence.

**7.** In determining whether the deprivation of the overtime received by relief supervisors was discriminatory, it is not relevant that the practice of awarding such overtime was disfavored or ultimately discontinued by the com-

perform his job was directly affected by the refusal of his coworkers to work under his direction on occasion.

■ Additionally, McGinest was subjected to extreme racial insults, as well as more subtle taunts, by supervisors and coworkers. Racist graffiti such as "nigger" and "white is right" regularly appeared in the bathroom and on equipment, and on one occasion a management-level employee called McGinest "stupid nigger" to his face. Although it is clear that "[n]ot every insult or harassing comment will constitute a hostile work environment," "[r]epeated derogatory or humiliating statements ... can constitute a hostile work environment." *Ray v. Henderson*, 217 F.3d 1234, 1245 (9th Cir.2000).

■■ In evaluating the significance of the statements in question, we consider the objective hostility of the workplace from the perspective of the plaintiff. *Nichols*, 256 F.3d at 872; *Ellison v. Brady*, 924 F.2d 872, 878–79 (9th Cir.1991). In *Ellison*, in the context of sexual harassment, we evaluated objective hostility from the perspective of a reasonable woman. As the Supreme Court has noted, "Hostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. at 116 n. 10, 122 S.Ct.

2061. We now state explicitly what was clear from our holding in *Ellison*, that allegations of a racially hostile workplace must be assessed from the perspective of a reasonable person belonging to the racial or ethnic group of the plaintiff.[8]

In *Ellison* we noted that "[a] complete understanding of the victim's view requires, among other things, an analysis of the different perspectives of men and women." 924 F.2d at 878. We explained:

> because women are disproportionately victims of rape and sexual assault, women have a stronger incentive to be concerned with sexual behavior. Women who are victims of mild forms of sexual harassment may understandably worry whether a harasser's conduct is merely a prelude to violent sexual assault. Men, who are rarely victims of sexual assault, may view sexual conduct in a vacuum without a full appreciation of the social setting or the underlying threat of violence that a woman may perceive.

*Id.* at 879 (citations omitted). Our analysis of the importance of interpreting gender discrimination from the perspective of a reasonable woman reverberates powerfully in the context of racial harassment. *See Stingley v. Arizona*, 796 F.Supp. 424, 428–29 (D.Ariz.1992) (noting that "*Ellison's* reasoning may be applied seamlessly to

---

pany. What is critical, however, is whether McGinest was treated differently because of his race. GTE contends that McGinest was paid nine and a half hours of overtime over a six month period during the time that the violations allegedly took place. This response only shows that the facts are in dispute regarding the extent of the alleged practice.

8. Following the Supreme Court's decision in *Harris v. Forklift Systems*, which referred to "an environment that a reasonable person would find hostile or abusive," 510 U.S. at 21, 114 S.Ct. 367, a number of courts refused to apply a reasonable person standard based on

the perspective of a person sharing the characteristics of the plaintiff. *See, e.g., Gillming v. Simmons Indus.*, 91 F.3d 1168, 1172 (8th Cir.1996); *Watkins v. Bowden*, 105 F.3d 1344, 1355–56 (11th Cir.1997). However, in *Oncale*, the Supreme Court recharacterized the *Harris* statement, making it clear that it is proper to use an individualized standard based upon the characteristics of the plaintiff. 523 U.S. at 78, 118 S.Ct. 998 ("We have emphasized, moreover, that the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.' ").

racist environment claims," and implementing a "reasonable person of the same gender and race or color" standard).

Racially motivated comments or actions may appear innocent or only mildly offensive to one who is not a member of the targeted group, but in reality be intolerably abusive or threatening when understood from the perspective of a plaintiff who is a member of the targeted group. "The omnipresence of race-based attitudes and experiences in the lives of black Americans [may cause] even nonviolent events to be interpreted as degrading, threatening, and offensive." *Harris v. Int'l Paper Co.*, 765 F.Supp. 1509, 1516 (D.Me.1991) (noting that "instances of racial violence or threatened violence which might appear to white observers as mere 'pranks' are, to black observers, evidence of threatening, pervasive attitudes"), *vacated in part on other grounds*, 765 F.Supp. 1529 (D.Me. 1991); *see also id.* (discussing "racial jokes, comments or nonviolent conduct which white observers are ... more likely to dismiss as nonthreatening isolated incidents"); *Dickerson v. State of New Jersey Dep't of Human Serv.*, 767 F.Supp. 605, 616 (D.N.J.1991) ("The mere mention of the KKK invokes a long and violent history sufficient to detrimentally affect *any* reasonable person of the same race as the plaintiff.") (emphasis in original). "Title VII tolerates no racial discrimination, subtle or otherwise." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). By considering both the existence and the severity of discrimination from the perspective of a reasonable person of the plaintiff's race, we recognize forms of discrimination that are real and hurtful, and yet may be overlooked if considered solely from the perspective of an adjudicator belonging to a different group than the plaintiff.

It is beyond question that the use of the word "nigger" is highly offensive and demeaning, evoking a history of racial violence, brutality, and subordination. This word is "perhaps the most offensive and inflammatory racial slur in English, ... a word expressive of racial hatred and bigotry." *Swinton v. Potomac Corp.*, 270 F.3d 794, 817 (9th Cir.2001) (ellipsis in original) (quotation marks omitted); *see also Daso v. The Grafton School, Inc.*, 181 F.Supp.2d 485, 493 (D.Md.2002) ("The word 'nigger' is more than [a]'mere offensive utterance'.... No word in the English language is as odious or loaded with as terrible a history."); *NLRB v. Foundry Div. of Alcon Indus., Inc.*, 260 F.3d 631, 635 n. 5 (6th Cir.2001) ("That the word 'nigger' is a slur is not debatable."). "Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." *Rodgers v. Western–Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir.1993) (citations and internal quotation marks omitted). The direct verbal attack on McGinest and the prevalence of graffiti containing a racial slur evocative of lynchings and racial hierarchy are significant exacerbating factors in evaluating the severity of the racial hostility.[9]

The district court observed that there was little evidence of racial animus for a number of the incidents described by McGinest, noting with approval GTE's contention that "there is no necessary association between African Americans and drug dealers." However, the Third Circuit has explained persuasively that "the use of

---

9. Moreover, a trier of fact might certainly conclude that, in light of Hughes' use of a racial slur, his other abusive remarks to

McGinest were also motivated by racial hostility.

'code words' can, under circumstances such as we encounter here, violate Title VII." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1083 (3d Cir.1996). The Third Circuit went on to note:

> [A] reasonable jury could conclude that the intent to discriminate is implicit in these comments. There are no talismanic expressions which must be invoked as a condition-precedent to the application of laws designed to protect against discrimination. The words themselves are only relevant for what they reveal—the intent of the speaker. A reasonable jury could find that statements like the ones allegedly made in this case send a clear message and carry the distinct tone of racial motivations and implications. They could be seen as conveying the message that members of a particular race are disfavored and that members of that race are, therefore, not full and equal members of the workplace.

*Id.* (citations omitted).[10] The reference to McGinest as a "drug dealer" might certainly be deemed to be a code word or phrase. In fact, reported cases have recognized the racial motivations behind this and other comments and slurs experienced by McGinest. *See, e.g., Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1273 (7th Cir. 1991) (noting that employer engaged in a "not-so-subtle attempt to link drugs ... with the plaintiff simply because he is black"); *Swinton*, 270 F.3d at 799 (noting that a "[r]eference to 'Pontiac' as an acronym for 'Poor old nigger thinks it's a

Cadillac' " was a "racially offensive joke"); *Jones v. City of Overland Park*, 1994 WL 583153 (D.Kan.1994) (recognizing reference to plaintiff as "Aunt Jemima" as one factor in hostile environment). GTE's attempt to deny the possible racial overtones of many of the comments made to McGinest or uttered in his presence indicates a willful blindness to racial stereotyping.

▮ The district court discounted the insults and hostile actions directed at McGinest by both Noson and DeLeon, reasoning that because Ketchum, a white worker, was also targeted, this behavior did not constitute actionable racial harassment. The district court erred in ignoring these interactions for several reasons. First, if racial hostility pervades a workplace, a plaintiff may establish a violation of Title VII, even if such hostility was not directly targeted at the plaintiff. *See, e.g., Woods*, 925 F.2d at 1202 (holding that work environment was racially hostile where "Woods was surrounded by racial hostility, and subjected directly to some of it"); *Stingley*, 796 F.Supp. at 426, 428 (finding racial and sexual harassment based in part on use of racist nicknames and slurs about another worker in presence of plaintiff); *Kishaba v. Hilton Hotels Corp.*, 737 F.Supp. 549, 554 (D.Haw. 1990) ("Even if Plaintiff herself was never the object of racial harassment, she might nevertheless have a Title VII claim if she were forced to work in an atmosphere in which such harassment was pervasive."). McGinest testified at his deposition that DeLeon directed racially charged com-

---

10. The Third Circuit explained the significance of these holdings as follows:

> Anti-discrimination laws and lawsuits have 'educated' would-be violators such that extreme manifestations of discrimination are thankfully rare. Though they still happen, the instances in which employers and employees openly use derogatory epithets to refer to fellow employees appear to be de-

> clining. Regrettably, however, this in no way suggests that discrimination based upon an individual's race, gender, or age is near an end. Discrimination continues to pollute the social and economic mainstream of American life, and is often simply masked in more subtle forms.

> 85 F.3d at 1081–82.

ments at Ketchum specifically in order to anger McGinest. If racial animus motivates a harasser to make provocative comments in the presence of an individual in order to anger and harass him, such comments are highly relevant in evaluating the creation of a hostile work environment, regardless of the identity of the person to whom the comments were superficially directed.

 Secondly, our case law is clear that the fact that an individual "consistently abused men and women alike" provides no defense to an accusation of sexual harassment. *Steiner*, 25 F.3d at 1463; *see also id.* at 1464. DeLeon's use of racially charged words to goad both black and white employees makes his conduct more outrageous, not less so; as in *Steiner*, were the conduct sufficiently severe or pervasive it might indeed raise the possibility that Ketchum himself could raise a claim of discrimination. *Id.*

Thirdly, the district court overlooked testimony that Ketchum was harassed because of his association with black employees. "Title VII has . . . been held to protect against adverse employment actions taken because of the employee's close association with black friends or coworkers. . . ." ARTHUR LARSON, EMPLOYMENT DISCRIMINATION, § 51.02 (2d ed.2003); *cf. Taylor v. Western & Southern Life Ins. Co.*, 966 F.2d 1188 (7th Cir. 1992) (affirming Title VII judgment for employee subjected to discrimination because of interracial marriage); *Brosmore v. City of Covington*, 1993 WL 762881 (E.D.Ky.1993) (noting significance under Title VII of detriment due to interracial association). Ketchum was not harassed for being white, nor were racial slurs mocking or insulting whiteness directed at

him. Instead, the evidence suggests that he was harassed for making friendships that crossed racial lines, and for his acts of solidarity.[11] Hostile conduct that attempts to sever or punish only those friendships that are interracial might certainly "pollute[ ] the victim's workplace," *Steiner*, 25 F.3d at 1463, and the district court erred in failing to consider this fact.

For purposes of summary judgment, McGinest persuasively demonstrates that he was subjected to a hostile work environment. He has presented evidence that over the past ten to fifteen years several racial incidents occurred each year, ranging in severity from being called racially derogatory names to experiencing a potentially life-threatening accident. As even the dissent recognizes, McGinest has raised a genuine issue of material fact with regard to the existence of a racially hostile workplace.

## B. Analysis of Remedial Measures

Because we conclude, for purposes of summary judgment, that McGinest suffered a hostile work environment, we must consider whether GTE is liable for the harassment. As a preliminary matter, we address the district court's overall approach to the question of remediation. The district court considered the sufficiency of GTE's remedial measures on an event-by-event basis, stating: "After eliminating the incidents for which McGinest's proof is wholly inadequate, and those incidents to which [GTE] has adequately responded, McGinest's case rests on a few sporadic occurrences of arguably racially motivated conduct." Although the district court's approach does not appear unreasonable at first blush, it led the court to underestimate the impact of the environ-

---

11. For example, following Noson's statement to McGinest that "only drug dealers can afford nice gold chains," Ketchum bought himself a gold chain which he subsequently wore to work every day.

ment on McGinest and underemphasize GTE's responsibility to take remedial action to discourage discriminatory conduct. Instead, a court must first assess whether a hostile work environment existed, and then determine whether the response was adequate as a whole.

■ An employer's liability for harassing conduct is evaluated differently when the harasser is a supervisor as opposed to a coworker. *Swinton,* 270 F.3d at 803. An employer is vicariously liable for a hostile environment created by a supervisor, although such liability is subject to an affirmative defense. *Nichols,* 256 F.3d at 877 (citing *Faragher v. City of Boca Raton,* 524 U.S. at 780, 118 S.Ct. 2275, 141 L.Ed.2d 662). "If, however, the harasser is merely a coworker, the plaintiff must prove that ... the employer knew or should have known of the harassment but did not take adequate steps to address it." *Swinton,* 270 F.3d at 803.

## 1. Vicarious Liability for Acts by Supervisors

■ An employer may raise a two-pronged affirmative defense to avoid vicar-

ious liability for a hostile environment created by a supervisor.[12] *Nichols,* 256 F.3d at 877. Although GTE mentions this defense in its motion for summary judgment, it does not raise it before us. In consequence, we assume that GTE is liable for the acts of its supervisors, and we leave it to the district court to evaluate the defense if it is raised on remand. *See Smith v. Mash,* 194 F.3d 1045, 1052 (9th Cir.1999). Thus, for the purposes of summary judgment we assume that GTE is liable for the offensive comments by coordinator Hughes[13] and supervisor Ledbetter, supervisor Roberts' denial of bonus pay for McGinest's overtime while a relief supervisor and refusal to provide for McGinest's automotive safety, and the derogatory comments and exposure to hazardous industrial situations by supervisor Noson.

## 2. Liability for Actions by Coworkers

■ "[E]mployers are liable for failing to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known." *El-*

---

**12.** The employer must show that 1) it exercised reasonable care to prevent and correct promptly any invidious harassment, and 2) that the plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or avoid harm otherwise. *Nichols,* 256 F.3d at 877.

**13.** GTE challenges McGinest's description of Hughes as *his* supervisor, but does not assert that Hughes was not *a* supervisor. Our case law does indeed distinguish between a situation in which a harasser supervises the plaintiff, where vicarious liability is available, versus those situations in which a harasser is a supervisor and yet does not supervise the plaintiff. *See Swinton,* 270 F.3d at 805. An employer is vicariously liable for actions by a supervisor who has "immediate (or successively higher) authority over the employee." *Faragher,* 524 U.S. at 806, 118 S.Ct. 2275.

Thus, this distinction is not dependent upon job titles or formal structures within the workplace, but rather upon whether a supervisor has the authority to demand obedience from an employee. *Cf. Burrell v. Star Nursery, Inc.,* 170 F.3d 951, 956 (9th Cir.1999).

The affidavits and deposition transcripts establish that the supervisorial structure of GTE was quite complex. *See, e.g.,* Declaration of McGinest (explaining "I work with five or six supervisors at one time"). If Hughes engaged in supervision of or had authority over McGinest, he would qualify as McGinest's supervisor even if the company did not define his role this way. *Swinton,* 270 F.3d at 803–05. The question of who was considered a supervisor by GTE, and whether its job categories suffice to satisfy the demarcations drawn under the case law interpreting Title VII is properly resolved by the district court on a more extensive factual record.

*lison v. Brady,* 924 F.2d at 881 (quoting *EEOC v. Hacienda Hotel,* 881 F.2d 1504, 1515–16 (9th Cir.1989)); *Swinton,* 270 F.3d at 803. GTE had actual knowledge of the events of which McGinest informed his immediate supervisor or manager, including the offensive comments by coworkers Daniel DeLeon, Jim Frick and Alex Talmadge, as well as the one incident of graffiti that was reported. Additionally, GTE had imputed knowledge regarding the remaining incidents of racist graffiti, because managers also used the restrooms and other facilities where this graffiti was prevalent.

▬▬ GTE may nonetheless avoid liability for such harassment by undertaking remedial measures "reasonably calculated to end the harassment." *Ellison,* 924 F.2d at 882; *see also Yamaguchi v. United States Dep't of the Air Force,* 109 F.3d 1475, 1482 (9th Cir.1997). "The reasonableness of the remedy depends on its ability to: (1) 'stop harassment by the person who engaged in the harassment;' and (2) 'persuade potential harassers to refrain from unlawful conduct.' " *Nichols,* 256 F.3d at 875 (quoting *Ellison,* 924 F.2d at 882). To be adequate, an employer must intervene promptly. *Intlekofer v. Turnage,* 973 F.2d 773, 778 (9th Cir.1992). Remedial measures must include some form of disciplinary action, *Yamaguchi,* 109 F.3d at 1482, which must be "proportionate[ ] to the seriousness of the offense," *Ellison,* 924 F.2d at 882 ("Title VII

requires more than a mere request to refrain from discriminatory conduct.").

▬▬ GTE took action by counseling DeLeon and by painting over the racial graffiti reported in April 1998. GTE alleges that these remedial measures stopped the harassment, and were therefore sufficient to protect it from liability. However, it is clear that McGinest has presented sufficient evidence to establish disputed issues of material fact with regard to the adequacy of the remedial measures taken by GTE. In fact, on the record before us, GTE would be unable to avoid liability through its remedial measures.

First, GTE only responded to the one act of graffiti that was reported, despite the fact that GTE knew or should have known of numerous other instances. Inaction constitutes a ratification of past harassment, even if such harassment independently ceases. *Fuller v. City of Oakland,* 47 F.3d 1522, 1529 (9th Cir.1995) (noting that Title VII condemns "the existence of past harassment, every bit as much as the risk of future harassment"); *Nichols,* 256 F.3d at 875–76 ("When the employer undertakes no remedy, or where the remedy does not end the current harassment and deter future harassment, liability attaches for both the past harassment and any future harassment.").

Additionally, although painting over the graffiti was a necessary first step, the record before us reveals no actions taken by GTE to ensure that this recurrent problem would cease,[14] and in fact it did

---

**14.** GTE took no action to send a message that such graffiti was intolerable, or to recognize that it differed in kind from other graffiti prevalent in the bathrooms. *Snell v. Suffolk County,* 782 F.2d 1094, 1104–05 (2d Cir. 1986). GTE could have heavily emphasized to all employees that serious punishment would result if the perpetrators of this or future incidents were caught, underlining the fact that such behavior was neither tolerated

or condoned. *Nichols,* 256 F.3d at 876; *Daniels,* 937 F.2d at 1275. At a minimum, GTE could have informed the offended employees that it would make efforts to prevent the reappearance of such graffiti, and had a manager check the areas in question on a regular basis to ensure that this problem did not recur. *Nichols,* 256 F.3d at 876 (noting that employer conducted spot checks). On the

not cease. Thus, this case resembles *Daniels v. Essex Group*, in which inadequate remediation was found where similar racist graffiti reappeared after being painted over, "the defendant made virtually no effort to investigate the incidents," 937 F.2d at 1275, and management neither called a meeting of the workforce to condemn the racial harassment nor issued "a warning announcing the employer's abhorrence of racial harassment," *id.* at 1267.

Furthermore, the reactions of management upon learning about the graffiti indicate that the incident was not taken seriously. After being informed about the graffiti, supervisor Roberts first joked that he himself was responsible for it, and then added an additional "humorous" comment that had racial overtones.[15] Rather than remedying the harassment, Roberts' behavior appears to have added to it.

GTE's remediation of DeLeon's racial comments also gives cause for concern. Although counseling and a warning may suffice if successful in stopping the harassment, *see Intlekofer*, 973 F.2d at 779, GTE did not issue this warning until McGinest had filed a complaint with the EEOC. In fact, McGinest had informed his manager or immediate supervisor of the events involving Noson, Hughes, DeLeon, and others, to no avail. In each of these cases, GTE did not respond until McGinest initiated formal proceedings. This delay does not satisfy Title VII's requirement of prompt remedial action. *See, e.g., Fuller*, 47 F.3d at 1528; *Intlekofer*, 973 F.2d at 778; *Steiner*, 25 F.3d at 1464.

Taken as a whole, GTE's responses were troubling for another reason. We have been clear that in order to be adequate, remedial actions must be designed not only to prevent future conduct by the harasser, but also by other potential harassers. *See, e.g., Fuller*, 47 F.3d at 1528; *Nichols*, 256 F.3d at 875; *Ellison*, 924 F.2d at 882. GTE's actions may have been successful in persuading identified harassers to cease their activities. But over a ten-year period, McGinest was subjected to inappropriate comments by a minimum of six individuals, and was allegedly physically endangered or financially harmed through the actions of several others. On the record before us, GTE took no action to ensure that this level of harassment did not continue for the rest of McGinest's tenure at the company.

## IV.

## FAILURE TO PROMOTE

The remaining two claims raised by McGinest involve GTE's failure to promote him to the position of Outside Plant Construction Installer Supervisor in October 1998. McGinest alleges that he was denied this promotion because of racial discrimination and in retaliation for his complaint to the EEOC regarding the hostile work environment.

### A. Racial Discrimination

█ Under Title VII, an individual suffers disparate treatment "when he or she is 'singled out and treated less favorably than others similarly situated on account of race.' " *Jauregui v. City of Glendale*, 852 F.2d 1128, 1134 (9th Cir.1988) (quoting *Gay v. Waiters' & Dairy Lunchmen's Union*, 694 F.2d 531, 537 (9th Cir.1982)); 42

record before us, GTE did none of these things.

15. Since Roberts responded to news of the objectionable graffiti by quoting Rodney King's question, "Why can't we all just get along?" which was itself an allusion to black-white racial strife, the evidence before us implies that Roberts may well have understood the nature of the graffiti.

U.S.C. § 2000e–2(a) (2003). Failure to promote is a common manifestation of disparate treatment. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Warren v. City of Carlsbad,* 58 F.3d 439, 440–41 (9th Cir.1995); *Jauregui,* 852 F.2d at 1134.

"[T]he plaintiff in a disparate treatment case must show the employer's intent to discriminate, but intent may be inferred from circumstantial evidence." *Id.* (quoting *Domingo v. New England Fish Co.,* 727 F.2d 1429, 1435 (9th Cir. 1984)). The parties debate at length the question of whether McGinest adduced direct or circumstantial evidence of discrimination, and the relevance of the resolution of this question to the proper analytical framework by which a disparate treatment claim is evaluated. Their confusion is understandable considering the proliferation of conflicting case law on this question. *See Costa v. Desert Palace,* 299 F.3d 838, 852–53 (9th Cir.2002) (reviewing case law and describing it as a "quagmire that defies characterization," "chaos," and a "morass"), *aff'd by* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). However, the Supreme Court recently brought much-needed clarity to this area of law when it affirmed our en banc opinion in *Costa v. Desert Palace.*

In *Costa,* the Supreme Court held that circumstantial and direct evidence should be treated alike, noting: "Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." 123 S.Ct. at 2154 (quoting *Rogers v. Missouri Pacific R.R. Co.,* 352 U.S. 500, 508 n. 17, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957)). Because the Supreme Court held that the distinction between direct and circumstantial evidence is irrelevant to determining what analytical framework to apply, we need not resolve the parties' arguments regarding the proper characterization of McGinest's evidence.

Our decision in *Costa* establishes that although the *McDonnell Douglas* burden shifting framework [16] is a useful "tool to assist plaintiffs at the summary judgment stage so that they may reach trial," "nothing compels the parties to invoke the *McDonnell Douglas* presumption." 299 F.3d at 855. Rather, when responding to a summary judgment motion, the plaintiff is presented with a choice regarding how to establish his or her case. McGinest may proceed by using the *McDonnell Douglas* framework, or alternatively, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated GTE. *Id.* (noting that plaintiff may succeed by introducing "other sufficient evidence—direct or circumstantial—of discriminatory intent").

The district court applied the *McDonnell Douglas* test. It determined that McGinest established a prima facie case of failure to promote due to racial discrimination. McGinest 1) is a member of a protected class; 2) applied for and was qualified for an open job; 3) was rejected for that job; and 4) rather than filling the position by promoting any of the interviewees, GTE transferred a white manager into the position.[17] GTE produced a legiti-

---

16. Under the *McDonnell Douglas* burden shifting framework, a plaintiff must first establish a prima facie case of unlawful discrimination. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the action. If the employer does so, the plaintiff must show that the articulated reason is pretextual. *McDonnell Douglas Corp.,* 411 U.S. at 802–804, 93 S.Ct. 1817.

17. Although this fourth factor is not identical to the one employed in *McDonnell Douglas,* it is widely recognized that the test is a flexible

mate, nondiscriminatory reason for the action, claiming that it was due to a hiring freeze. The district court concluded, however, that McGinest failed to produce evidence indicating that the reason given by GTE was a pretext, and thus granted summary judgment to GTE.

Once the defendant produces evidence of a legitimate nondiscriminatory reason to counter the plaintiff's demonstration of a prima facie case, the *McDonnell Douglas* "presumption of discrimination 'drops out of the picture.' " *Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). Because the district court correctly found that the first two steps of the *McDonnell Douglas* framework had been established, "the sole remaining issue was 'discrimination *vel non.*' " *Id.* (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 714, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)). Thus, despite the parties' vociferous contentions, in this case it is not particularly significant whether McGinest relies on the *McDonnell Douglas* presumption or, whether he relies on direct or circumstantial evidence of discriminatory intent to meet his burden. Under either approach, McGinest must produce some evidence suggesting that GTE's failure to promote him was due in part or whole to discriminatory intent, and so must counter GTE's

explanation that a hiring freeze accounted for its failure to promote him.

■ As McGinest argues, the absence of any documentation confirming that a company hiring freeze was in place during the relevant time period is sufficient to raise a genuine factual dispute as to whether the asserted reason was pretextual. Indeed, even if such decisions were commonly conveyed to yard managers by word-of-mouth, the fact that a company the size of GTE does not have a memorandum, meeting notes, or other evidence of this hiring freeze or the financial difficulties that allegedly spurred the hiring freeze provides circumstantial evidence that the hiring freeze did not in fact exist.[18]

"Proof that the defendant's explanation is unworthy of credence is [a] form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves,* 530 U.S. at 147, 120 S.Ct. 2097. Additionally, GTE's permissive response to harassing actions undertaken by coworkers and supervisors, combined with the absence of black supervisors and managers in the workplace, also is circumstantial evidence of pretext. *See McDonnell Douglas,* 411 U.S. at 804–05, 93 S.Ct. 1817 (noting that possible methods of demonstrating pretext include "treatment of [the employee] during his prior term of employment ... and [the employer's] general policy and practice with respect to minority employment," such as

one and the prima facie case described was "not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. 1817; *see also Swierkiewicz v. Sorema,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). GTE's suggestion that McGinest does not establish the fourth factor is unpersuasive.

**18.** McGinest requests that we take judicial notice of GTE's Annual Report from 1998 as

well as a news release from the California Public Utilities Commission. These documents allegedly show that, contrary to the explanation given for the hiring freeze, GTE was in glowing financial health in 1998. However, since these documents were not presented to the district court, we do not consider this information in reaching our conclusion.

information demonstrating "a general pattern of discrimination against blacks"); *Warren,* 58 F.3d at 443–44 (holding that plaintiff raised a genuine issue of material fact as to employer's motive by showing that less-qualified white employees were promoted over him, combined with racist remarks and statistical evidence); *Bergene v. Salt River Project Agric. Improvement & Power Dist.,* 272 F.3d 1136, 1143 (9th Cir.2001) (holding that absence of female supervisors was one factor establishing pretext for failure to promote).

We have held that "very little[ ] evidence is necessary to raise a genuine issue of fact regarding an employer's motive; any indication of discriminatory motive ... may suffice to raise a question that can only be resolved by a fact-finder." *Schnidrig,* 80 F.3d at 1409. "When [the] evidence, direct or circumstantial, consists of more than the *McDonnell Douglas* presumption, a factual question will almost always exist with respect to any claim of a nondiscriminatory reason." *Sischo–Nownejad,* 934 F.2d at 1111; *see also Lam,* 40 F.3d at 1564. As the district court recognized, this is a close case. Such uncertainty at the summary judgment stage must be resolved in favor of the plaintiff. *Id.* ("We require very little evidence to survive summary judgment precisely because the ultimate question is one that can only be resolved through a 'searching inquiry'— one that is most appropriately conducted by the fact finder, upon a full record."). Because a number of factors cast doubt upon GTE's proffered explanation for its

failure to promote McGinest, while providing support for his contention regarding racial discrimination, McGinest has met his burden of showing "a genuine factual issue with regard to discriminatory intent." *Lam,* 40 F.3d at 1559.

**B. Retaliation**

■■■ Section 704 of Title VII prohibits retaliation against an employee for opposing unlawful discrimination. 42 U.S.C. § 2000e–3(a) (2003). Like discrimination, retaliation may be shown using the *McDonnell Douglas* burden shifting framework. To establish a prima facie case of retaliation under Title VII, McGinest must show 1) that he acted to protect his Title VII rights; 2) that an adverse employment action was thereafter taken against him; and 3) that a causal link existed between the two events. *Steiner,* 25 F.3d at 1464. If a prima facie case is established, the burden then shifts to the employer to proffer an alternative explanation for its action, which the employee may attempt to rebut.

■■■ McGinest has established the first and second prongs of the prima facie case.[19] However, McGinest has not presented sufficient evidence to demonstrate a causal link between his complaint and the denial of the promotion. Because the two events were separated by a year and a half, the timing alone does not establish a connection, and McGinest does not offer any other explanation. *See Villiarimo v.*

19. By filing a complaint with the EEOC, McGinest engaged in the quintessential action protected by § 704. *See Ray v. Henderson,* 217 F.3d 1234, 1240 n. 3 (9th Cir.2000) ("As the statutory language ... indicates, filing a complaint with the EEOC is a protected activity."); *Hashimoto v. Dalton,* 118 F.3d 671, 680 (9th Cir.1997) (holding that simply meeting with EEO counselor is protected activity because it constitutes participation "in the machinery set up by Title VII to enforce its provisions"). An adverse employment action is one that "is reasonably likely to deter employees from engaging in protected activity," *Ray,* 217 F.3d at 1243; clearly, denial of a promotion qualifies as an adverse employment action. *See, e.g., Bergene,* 272 F.3d at 1141; *Brooks v. City of San Mateo,* 229 F.3d 917, 928 (9th Cir.2000).

*Aloha Island Air, Inc.,* 281 F.3d 1054, 1065 (9th Cir.2002). Thus, we affirm the district court's dismissal of the retaliation claim.

## CONCLUSION

We reverse the district court's grant of summary judgment on the first two counts, and remand to the district court for further proceedings. McGinest established the existence of material questions of fact with regard to whether GTE created and failed to remedy a racially hostile working environment. McGinest also has shown a genuine issue of material fact as to whether GTE's failure to promote him was based on racial discrimination. However, we affirm the district court's dismissal of the retaliation claim.

Appellant shall recover costs on appeal.

**AFFIRMED** in part, **REVERSED** in part, and **REMANDED.**

O'SCANNLAIN, Circuit Judge, concurring in part and dissenting in part.

I agree that the court must reverse the grant of GTE's motion for summary judgment and remand for further proceedings on McGinest's hostile work environment; regrettably, however, I cannot concur in the majority's analysis, and thus dissent from the reasoning of Part III. I disagree with the court's reversal of the dismissal on summary judgment of McGinest's discriminatory failure to promote claim and thus dissent from Part IV.A.; I would affirm. But I do agree that we must affirm dismissal on summary judgment of McGinest's retaliatory failure to promote claim, and thus concur in Part IV.B. of the court's opinion as to result and analysis.

Because I believe the majority's opinion sidesteps *Raytheon Co. v. Hernandez,* — U.S. ——, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003), essentially abandons *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), and creates an unreasonable expansion of Title VII liability in the workplace, I must respectfully dissent from the opinion of the court to the foregoing extent.

I

Title VII prevents the establishment of a "hostile work environment" that becomes "sufficiently severe or pervasive to alter the conditions of [one's] employment." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *see* 42 U.S.C. § 2000e–2(a)(1).

Our evaluation of such claims requires an examination of the totality of the circumstances. *Harris. v. Forklift Systems, Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) ("[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances."); *Fuller v. City of Oakland,* 47 F.3d 1522, 1527 (9th Cir.1995) ("Hostility [under Title VII] must be measured based on the totality of the circumstances."). This appraisal includes consideration of "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23, 114 S.Ct. 367.

A

However, before considering the totality of the circumstances, we must first determine exactly which of the plaintiff's claims properly form a part of that inquiry. Because the district court dismissed this case on summary judgment, we must review the evidence in the light most favorable to the plaintiff. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contr. Ass'n,* 809 F.2d 626, 630–31 (9th Cir.1987). Yet even under this defer-

ential standard, not every allegation must be taken at face value, nor is every factual claim necessarily available to impose potential liability. The majority, regrettably, appears to assume the opposite, for its analysis hardly considers the suitability of McGinest's allegations. The court's opinion appears not only to presume that all facts are true, but that every allegation is admissible evidence of a hostile work environment upon which liability may be based. There is no recognizable legal support for this approach.

Specifically, my review of our precedent indicates that there are at least two kinds of allegations that may not be considered at summary judgment as evidence of liability for a particular hostile work environment claim: First, if any distant act "was no longer part of the same hostile environment claim, then the employee cannot recover for the previous act[ ]." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Second, claims that amount to mere "conclusory allegations" are insufficient to merit consideration. *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1116 (9th Cir.2003). With these principles in mind, I believe it is necessary to undertake a careful review of McGinest's numerous allegations before one may fairly judge the strength of his Title VII claim.

1

GTE urges that the events involving supervisor Noson must be excluded as distant acts beyond the statutory scope of the rest of McGinest's hostile work environment claim. Title VII does indeed require that a "charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred." [1] 42 U.S.C. § 2000e–5(e)(1). Of course, we must not engage in overly literal interpretations of this statute of limitations. *See Morgan*, 536 U.S. at 115–21, 122 S.Ct. 2061. So the simple fact that some of the alleged discriminatory acts occurred outside the limitations period does not automatically preclude their admission. Rather, "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *Id.* at 105, 122 S.Ct. 2061.

a

The majority, however, appears to take this concept to an extreme, implying that so long as any single act occurs within the statute of limitations, *all* alleged acts—no matter how far in the past—become part of the same hostile work environment claim. It dismisses the statute of limitations argument in a footnote, and explicitly considers Noson's conduct because it is merely "possible" that it functioned as part of the same claim. Maj. Op. at 1114 n. 6. It is our duty faithfully to apply controlling precedent, and I do not believe that *Morgan's* threshold can be so pitifully low. Indeed, I believe the majority's "possibly part of the same claim" standard eviscerates *Morgan's* limitation.

To the contrary, I believe *Morgan* establishes a workable and relatively stringent standard: "if a [distant] act . . . had no relation to the [recent] acts . . ., or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environ-

---

1. The statute extends this limitations period to 300 days in certain circumstances not rele-

vant here. *See* § 2000e–5(e)(1).

ment claim, then the employee cannot recover for the previous acts." [2] *Morgan,* 536 U.S. at 118, 122 S.Ct. 2061. Employers retain additional protections beyond even this principle because distant acts alleged as part of a single hostile work environment claim also remain "subject to waiver, estoppel, and equitable tolling when equity so requires." *Id.* at 121, 122 S.Ct. 2061 (internal quotation omitted).

With respect, while the court's opinion formally recognizes this language, it fails to apply it. The majority appears to argue that we need not take *Morgan* seriously because "neither the district court nor the parties had the benefit of" that decision. Maj. Op. at 1114 n. 6. This is irrelevant. *Morgan* imposes a rule of law establishing when a particular fact may support a legal claim. And, of course, "[o]ur duty is to interpret the law." *Seaman v. Comm'r of Internal Revenue,* 479 F.2d 336, 338 (9th Cir.1973).

The majority also emphasizes that *Morgan* deals with an employer's "*liability.*" Maj. Op. at 1114 n. 6 (emphasis in original). I am unable to recognize the significance of such a distinction, or why it would counsel for application of the majority's nearly nonexistent threshold. The district court's summary judgment order, which we now review on appeal, determined precisely the issue of GTE's potential liability. *Morgan* is thus directly relevant, and I respectfully believe that we must determine which of McGinest's assertions are properly encompassed in his hostile work environment claim *before* determining whether that claim properly survives summary adjudication. For it is clearly incorrect to consider every claim a plaintiff makes—no matter how stale or unsupported—in adjudicating a motion for summary judgment. *See Morgan,* 536 U.S. at 118, 122 S.Ct. 2061; *Hernandez,* 343 F.3d at 1116.

Of course, determining the scope of events that may be considered for purposes of establishing liability does not affect Federal Rule of Civil Procedure 16 and the admissibility of stale evidence for other purposes. For example, an utterance, though time barred for purposes of liability, may be admissible to challenge the credibility of a witness as a prior inconsistent statement. *See* Fed.R.Evid. 613.

But summary judgment is about establishing liability. Thus, I must respectfully disagree with the majority's implication that both *Morgan* and *Lyons v. England,* 307 F.3d 1092 (9th Cir.2002) might be extended to allow time-barred evidence to be used at summary judgment as "background evidence" of a hostile work environment claim. *See* Maj. Op. at 1114 n. 6. The quoted language from *Morgan,* and the entire *Lyons* opinion, dealt only with discrete act claims. In such cases, a plaintiff may rely on time-barred evidence as a "background" to help establish that an adverse employment decision was actually based on discriminatory animus. *See Lyons,* 307 F.3d at 1110 ("In the context of a racial disparate treatment claim, admissible background evidence must be relevant to determine the ultimate question: whether the defendant intentionally discriminated against the plaintiff because of his race." (internal quotations and edit marks omitted)).

However, "[h]ostile environment claims are different in kind from discrete acts." *Morgan,* 536 U.S. at 115, 122 S.Ct. 2061.

---

**2.** While I may agree with the majority that this rather broad standard has yet to be fully fleshed out, I must respectfully disagree with its assertion that such imprecision somehow turns clear Supreme Court precedent into nothing more than an "impli[cation]." *See* Maj. Op. at 1114 n. 6.

Under *Morgan,* evidence of a hostile work environment may extend beyond the statute of limitations period *if it is related. See id.* at 118, 122 S.Ct. 2061. But if evidence is *un* related to a claim, it must necessarily be irrelevant to that same claim. *See, e.g., Eclipse Assocs. v. Data General Corp.,* 894 F.2d 1114, 1119 (9th Cir.1990) (equating "unrelated" with "irrelevant"). So evidence that is time-barred under the *Morgan* standard cannot be considered at summary judgment because it is simply not relevant to the question of whether *wholly unrelated* conduct amounts to a hostile work environment. The very term "background evidence" makes little sense in this context because no "background" of discriminatory animus can be established from unrelated, irrelevant activity. Such evidence may well have *triggered* liability in the past, but that was liability upon which the plaintiff declined to act. Allowing consideration of stale, unrelated events as "background evidence" at summary judgment guts the concept of a statute of limitations in the hostile work environment context, and only serves as a backdoor method by which to introduce time-barred statements to avoid summary dismissal.

I also find no basis for the assertion that we lack facts necessary properly to interpret *Morgan.* Maj. Op. at 1114 n. 6. The record includes detailed information regarding Noson's actions, as amply related by the majority's opinion. The district court made specific findings regarding GTE's response, and when and where the alleged conduct occurred, including the fact that it "took place seven years before McGinest filed his EEOC complaint." Thus, unlike the majority, I feel obligated to determine whether McGinest's claims

regarding Noson are time-barred under a standard stringent enough to comply with *Morgan's* dictates.

b

McGinest's claims involving Noson occurred in the late 1980s culminating in Noson's dual apologies, as requested by GTE, in 1990. McGinest makes *no further* allegation of objectionable conduct by Noson since those apologies. The next formal notice of discriminatory conduct occurred after McGinest filed his EEOC complaint in 1997. In fact, McGinest himself alleges no discrimination of any kind between 1990 and 1995, when he claims to have been denied equal bonus pay. Construed as liberally as possible,[3] no less than 1,500 days elapsed between the successful resolution of Noson's behavior and all other alleged misconduct. Strikingly, 1,500 days amounts to more than *eight* full, consecutive Title VII statutory limitations periods. *See* 42 U.S.C. § 2000e–5(e)(1). Each of the exclusions set forth in *Morgan,* therefore, apply.

First, the acts involving Noson cannot reasonably be understood to have any "relation to" the subsequent allegations setting forth a hostile work environment claim. During the intervening several years, McGinest received at least one change in job title and at least one transfer, such that he no longer worked with or for Noson, and no longer worked at the same GTE location. In fact, the only relationship between these distant acts and all the other alleged conduct is that (1) they were discriminatory; and (2) GTE employed McGinest throughout.

Contrary to the majority's implication, I do not believe these facts alone can estab-

---

**3.** As discussed below, I do not believe we may consider McGinest's unequal pay claim. However, for purposes of this analysis, I assume even that these facts may form part of a single hostile work environment claim.

lish a sufficient "relation" as that term has been defined by the Supreme Court. *See Morgan,* 536 U.S. at 118, 122 S.Ct. 2061. This is because every hostile work environment claim is by definition asserted against a single employer for discriminatory conduct. Thus, the majority's version of "relation" would be satisfied even if a plaintiff alleged only two instances of differing forms of offensive conduct, perpetrated by different people, in different locations, separated by twenty-five years.

The Supreme Court has not yet given us specific guidance on the precise contours of a sufficient relation, so, for now, this is our job. Perhaps evidence of adequate relation might consist of the following:[4] an identity of offenders, an identity of location, an identity of a sufficiently distinct mode of harassment, or a reasonable identity of time in relation to the applicable statute of limitations. McGinest failed to submit any such evidence. The offenders differed, the place of the offense differed, and, even if all the alleged conduct was discriminatory by nature, the particular form of abuse differed. And, taken in the light most favorable to McGinest, there is no reasonable identity of time. *Morgan* itself provides a guiding example. Based on a 300 day statute of limitations, the Court concluded that conduct extending over a 400–day period—even if separated by 300 days within that time—reasonably could be construed as part of the same claim. *Id.* at 118, 122 S.Ct. 2061. In McGinest's case, discriminatory conduct separated by at least *1,500 days* cannot be understood to present a reasonable identity of time in relation to the *180–day* statute of limitations.

Second, it is conceded that GTE engaged in "certain intervening action" to prevent Noson's conduct from reoccurring. *Id.* For, while GTE concluded that there was no racial discrimination, it nonetheless required Noson to apologize. Perhaps McGinest may have preferred a stronger response from GTE. But the fact that there are no allegations of harmful conduct by Noson—or by anyone else for several years—necessarily establishes that GTE's intervening response was at least sufficient to maintain an acceptable work environment for eight full, consecutive exhaustions of the statute of limitations.[5]

Finally, if Noson's conduct created a hostile work environment in 1990, even despite GTE's response, McGinest had by 1995 waived his right to bring any resulting Title VII claim many times over. It is

---

4. This list represents my own effort at interpreting and applying *Morgan's* relation requirement. *Morgan,* 536 U.S. at 118, 122 S.Ct. 2061. It is not necessarily exhaustive, nor is any one factor necessarily sufficient.

5. The majority suggests that GTE's internal understanding of the nature of the conduct somehow displaces the undisputed fact that it *actually took* intervening action—*twice. See* Maj. Op. at 1114 n. 6. It is irrelevant that GTE described Noson's behavior as "shoptalk," for that subjective characterization did not change the fact that it nonetheless demanded that Noson put a stop to it. Under the majority's theory, a company which, in an effort to avoid a potential lawsuit, undisputably responded to and remedied an instance of offensive conduct may nevertheless be liable for

creating a hostile work environment because "avoiding a lawsuit" presumably would not provide the basis for a sufficiently "[ ]satisfactory response." Maj. Op. at 1114 n. 6.

The majority cites no legal authority for the quasi-existential proposition that the subjective motivation for an action might somehow undermine the very existence of the action itself. Thus, with respect, I find no basis for the majority's conclusion that GTE "did not respond" to Noson's conduct. Maj. Op. at 1121. The issue here is not whether McGinest felt validated by his employer, but whether GTE may remain liable for conduct it intended to stop, and did stop for at least four years. *See Morgan,* 536 U.S. at 118, 122 S.Ct. 2061.

contrary to the principles of equity to allow McGinest to include these allegations as part of a hostile work environment claim arguably "redeveloping" nearly five years later. For, "when [a] delay is caused by the employee, .... the federal courts have the discretionary power to locate 'a just result' in light of the circumstances peculiar to the case." *Id.* at 121, 122 S.Ct. 2061 (internal citations and quotations omitted). It might be one thing if discrete acts making up the hostile work environment claim continued at regular intervals for a period significantly longer than the 180-day limitation. Yet we should not countenance McGinest's attempts to revive the Noson allegations when, after at least 1,500 days of experiencing acceptable working conditions, he failed to alert the EEOC and failed to file suit. He should not now retroactively invoke these claims after so long a period of apparent calm.

For these reasons, I respectfully disagree with the majority's conclusion that Noson's conduct may form the basis for McGinest's present hostile work environment claim. Instead, I believe they are excluded by § 2000e–5(e)(1).

### 2

GTE would also exclude certain factual claims as mere "conclusory allegations." *Hernandez,* 343 F.3d at 1116. The majority briefly dispenses with this argument. *See* Maj. Op. at 1113 n. 5 (accepting McGinest's testimony because it "would suffice to enable a reasonable trier of fact to conclude that discrimination had occurred, without the need for further corroborating evidence"). The majority apparently concludes that McGinest set forth sufficient factual detail in his allegations so as to survive summary judgment. *See id.* (relying on *United States v. One Parcel of Real Prop.,* 904 F.2d 487, 491–92 (9th Cir.1990)

(denying summary judgment for the government in a land forfeiture case)). However, *One Parcel* is not a Title VII case, where the analysis is somewhat more nuanced. For, in the hostile work environment context, McGinest must demonstrate something more than evidence suggesting that he experienced hostility. He must also sufficiently demonstrate that any hostility arose "because of [his] race." 42 U.S.C. § 2000e–2(a)(1); *see Holly D. v. Cal. Inst. of Tech.,* 339 F.3d 1158, 1174 (9th Cir.2003) (holding, in workplace sexual harassment context, that even if supervisor-employee sexual relations occurred, "we require more than conclusory allegations that the supervisor proposed a sexual liaison and the employee responded to the overtures in order to protect her employment interests"). A plaintiff might allege sufficient detail to suggest that a hostile event occurred, but fail to provide anything more than the unsupported conclusion that race motivated it. I am not certain whether the majority fully considered this latter requirement. For, in my view, two of McGinest's claims appear to fail under this standard.

### a

First is the incident involving McGinest's truck tire. No one disputes that he was involved in a serious automobile accident due to a blown-out tire. McGinest alleges that not long before the accident, he requested and was denied new tires by GTE mechanics—even though at least one supervisor agreed that they looked bald. McGinest arguably produced sufficient evidence to suggest that such a denial occurred.

Yet McGinest includes this incident in his hostile work environment claim not because an alleged denial occurred, but because such a denial was based on his race. Unfortunately, however, McGinest

submitted no evidence to substantiate this charge. He does not claim, for instance, that the mechanics directly said or did anything to him to suggest that there was a racial component to such a denial. Nor does he present any circumstantial evidence that GTE provided mechanical services in a discriminatory manner.

Rather, McGinest relies only on the deposition testimony of Brand, which offers no support for his claim. Brand, who is white, did agree that sometimes it "seem[ed]" that vehicles driven by African–Americans were not "given the same level of maintenance as vehicles driven by white employees." However, he explicitly noted that this was only one possible interpretation of the mechanic's behavior—one that even he acknowledged was not necessarily supported by the facts. For Brand conceded that some of the same mechanics treated him poorly also, while they treated at least one other African–American employee "pretty well." Ultimately, the best that Brand could conclude was that "it could have been racial. It could have been just personality." By Brand's own admission, then, his direct experience and resulting testimony could not form a sufficient supporting basis for McGinest's allegations.

McGinest's accident was undoubtedly a traumatic experience. And given some of his experiences at GTE in other contexts, he might understandably suspect wide-ranging racial discrimination. Nevertheless, our precedent makes clear that individual claims of discriminatory treatment must be "supported by facts." *Id.* With respect to this allegation, at least, McGinest has failed to provide such evidence, and I do not believe we may consider it as part of his overall hostile work environment claim.

b

McGinest's claim of differential bonus overtime pay presents a similar problem. McGinest submitted time sheets showing that several white employees received more overtime pay than McGinest did over a (roughly) six-month time period in 1996.[6] Nevertheless, as noted above, McGinest must demonstrate not only that this differential existed, but that it arose *on account of* his race. *See* 42 U.S.C. § 2000e–2(a)(1) (prohibiting discrimination "because of such individual's race").

Here, McGinest claims that there was an "unwritten rule" regarding the payment of "relief supervisor pay," whereby arriving even five minutes early would earn employees a full hour of wages. While his immediate supervisor, Roberts, allowed others to claim this bonus, he is alleged to have prevented McGinest from doing so because of McGinest's race.[7] On the occasions McGinest attempted to note the bonus overtime on his time sheets, he alleges that Roberts erased it. While this additional information may provide context for McGinest's claims, they still rest on the conclusory allegation that the wage differential arose on account of race.

---

**6.** In the absence of additional evidence, the simple fact that some hourly employees receive more overtime than others would appear to reveal little beyond the fact that some people may indeed work more hours than others. In this sense, pay differentials arising from hourly positions would seem to carry less weight than those arising from analogous salaried positions.

**7.** According to McGinest, this practice meant that he received no compensation for any portion of the hour he actually worked, much less a bonus for the entire hour. In other words, he claims that he was denied pay for work actually completed. Regardless, this distinction does not affect the inquiry. For evidence that McGinest was denied actual pay *or* bonus pay on account of his race would support his hostile work environment claim.

Nevertheless, the record does not support McGinest's version of events. First, McGinest admitted in a deposition that the time sheets he submitted show no evidence of any relevant erasures.[8] Most damagingly, McGinest's own time sheets conclusively demonstrate that he actually received both overtime pay *and* "relief supervisor" pay. This clearly contradicts his assertion that he was completely barred from receiving such pay.

McGinest attempts to find support in Begg's admission that GTE may have allowed the bonus overtime practice sometime prior to 1993. However, McGinest appears selectively to read Begg's testimony. While Begg may have known of this practice in the past, he stopped it in 1993 when he became manager. And McGinest specifically alleged that his denials occurred from 1995 to 1997, well after Begg testified that the practice ended. In other words, McGinest's allegations find no support in Begg's testimony.

Notably, the EEOC investigated this complaint and determined that McGinest "had in fact been paid his due relief pay." The district court, as well, specifically found that there was "no credible evidence of a differential application of any 'unwritten rule' regarding relief supervisor overtime"—much less that the differential application arose on account of race. A careful review of the evidence compels the same conclusion: McGinest's allegations involving the "unwritten" relief supervisor rule are unsupported by Begg's testimony, and directly contradicted by McGinest's own time sheets. And to the extent that

McGinest's time sheets show that he received less overtime than four other white employees, he presented neither direct nor circumstantial evidence that the wage differential arose on account of race. Therefore, I believe this allegation must be excluded from our review of the totality of the circumstances, and I must dissent from the majority's use of it.

### 3

On the other hand, GTE's other contentions are unavailing. McGinest's remaining claims must be included as part of the "totality of the circumstances" we properly may consider. For example, at least some portion of the bathroom graffiti ("n—," [9] "P.O.N.T.I.A.C."), the banner graffiti ("n— History Month"), Hughes's comments (referring to McGinest as "a stupid n—"), Ledbetter's comments (criticizing McGinest while comparing him to "the other colored guy who used to work here"), DeLeon's comments (referring to McGinest as "mammy"), and Talmadge's comments (saying to McGinest, "I'll retire before I work for a black man") may all reasonably be understood as explicitly, racially hostile.

DeLeon's use of the term "Aunt Jemima" may also serve as evidence of racial hostility sufficient to survive summary judgment. DeLeon did not direct the phrase at McGinest himself, but rather to a white coworker and friend of McGinest's. Perhaps DeLeon truly did lack a racially hostile motive in his use of the nickname. However, a reasonable factfinder could conclude that it was meant to isolate McGi-

---

8. McGinest speculated that the EEOC might have time sheets from periods in which Roberts erased certain entries. Nevertheless, they do not appear in the record, and the time sheets McGinest did submit cover close to seven months' worth of work—almost twenty percent of the total time during which the erasures supposedly occurred.

9. For the sake of decorum, and because the court's opinion accurately recites the actual words in the record, I shall avoid the needless repetition of inflammatory language. I therefore use "n—" in place of the offensive racial slur.

nest by referring disparagingly, in his presence, to his friend as an African-American woman. Moreover, use of the term itself may reasonably be construed as racially hostile, whether directed at McGinest or not. *See, e.g., Woods v. Graphic Communications*, 925 F.2d 1195, 1202 (9th Cir.1991) (upholding hostile work environment judgment where prevailing plaintiff "was surrounded by racial hostility, and subjected directly to some of it"). Roberts's comments upon learning of the removal of the racist bathroom graffiti ("Oh well, I guess I'll have to write it again. Ah, why can't we all just get along?") arguably exhibited racial hostility as well. While GTE claims that Roberts did not know that the graffiti was racist in nature, this only creates a material factual dispute precluding summary judgment.

Finally, McGinest offered sufficient supporting evidence, including an affidavit from coworker Brand, from which a reasonable factfinder could conclude that at least some employees, including Talmadge and Frick ("I refuse to work for that dumb son of a bitch"), may have refused to work with McGinest because of his race.

### B

Once identifying which assertions are relevant and properly supported, we must consider whether McGinest presented sufficient evidence to survive summary judgment on his hostile work environment claim. Because the set of facts I review differs from that of the majority, I must conduct an independent analysis.

Three important principles bear upon the inquiry. First, because McGinest appeals from summary judgment dismissal, we must review the evidence in the light most favorable to him. *T.W. Elec.*, 809 F.2d at 630–31. Second, "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (internal quotation omitted).[10] Finally, McGinest's evidence must "prove that the conduct at issue was not merely tinged with offensive ... connotations, but actually constituted *discrimina[tion]* ... because of ... [race]." *Id.* at 81, 118 S.Ct. 998 (emphasis in original, internal quotation omitted).

### 1

With these principles in mind, I agree with the district court that this case presents a "close question" of whether a proper review of McGinest's admissible evidence suggests that GTE may be held liable in this case. Ultimately, however, I am satisfied that McGinest presented a triable issue of material fact on whether he was subjected to a hostile work environment. First, the opprobriousness of most of the comments, and the frequency with which they arose, could lead a reasonable fact-finder to conclude that together they amounted to more than "a mere offensive utterance." *Harris*, 510 U.S. at 23, 114 S.Ct. 367; *Swinton v. Potomac Corp.*, 270 F.3d 794, 817 (9th Cir.2001) (describing "n—" as "perhaps the most offensive and inflammatory racial slur in English"). Here, the repeated invocation of highly offensive language in a variety of contexts may be understood to have created a humiliating atmosphere as seen from the objective perspective of a reasonable Afri-

---

**10.** While *Oncale* dealt with sexual harassment, the Supreme Court instructs that "[h]ostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment." *Morgan*, 536 U.S. at 116 n. 10, 122 S.Ct. 2061.

can–American. *Oncale,* 523 U.S. at 81, 118 S.Ct. 998; *Harris,* 510 U.S. at 21, 114 S.Ct. 367 (requiring a hostile work environment to be "severe or pervasive enough to create an objectively hostile or abusive work environment"). Further, at least the stated refusal of certain colleagues to work with McGinest because of his race may have "unreasonably interfere[d] with [McGinest's] work performance." *Harris,* 510 U.S. at 23, 114 S.Ct. 367. Finally, McGinest's frequent complaints, both formal and informal, reasonably allow the conclusion that he "subjectively perceive[d] the environment to be abusive." *Id.* at 21, 114 S.Ct. 367.

Even if a hostile working environment exists, "an employer is only liable for failing to remedy harassment of which it knows or should know." *Fuller,* 47 F.3d at 1527. As the majority correctly notes, when a supervisor engages in harassing conduct, the employer generally may be held "vicariously liable for a hostile environment created by a supervisor." *Nichols v. Azteca Rest. Enters., Inc.,* 256 F.3d 864, 877 (9th Cir.2001). In supervisor-harassment circumstances, then, GTE may not defend for lack of knowledge of the conduct. Therefore, no notice is required for the comments made by supervisors Ledbetter and Roberts. Hughes is a somewhat more complicated case. Both McGinest and the EEOC describe Hughes as "[McGinest]'s Manager," but GTE challenges whether he was McGinest's manager or just *a* manager. This only demonstrates that there is genuine factual dispute on the issue. At this stage of the proceedings, then, I agree that we must accept McGinest's allegations as true and that GTE would be vicariously liable for Hughes's comments as well. Still, comments by these three men make up a relatively small portion of McGinest's allegations.

2

Employers are not necessarily vicariously liable for coworker harassment, however, in which case lack of notice can defeat hostile work environment claims. *Swinton,* 270 F.3d at 803. McGinest alleges that he notified his immediate supervisors of at least one instance of offensive bathroom graffiti, of DeLeon's comments, of Talmadge's comments, and of the stated refusal of some employees to work with him. GTE notes that many of these incidents were not formally reported to "management." I need not determine whether this distinction generally makes a difference because in this case, GTE's own anti-discrimination policy specifically directs employees to discuss discrimination concerns "with *your supervisor* or human resources representative" (emphasis added). In general, employers "are liable for failing to remedy or prevent a hostile work environment of which management-level employees knew, or *in the exercise of reasonable care should have known.*" *Swenson v. Potter,* 271 F.3d 1184, 1202 (9th Cir.2001) (emphasis in original, internal quotations omitted). Because McGinest followed GTE's own instructions for reporting discrimination, at least management reasonably "should have known" of the existence of the complaints.

Allegations involving the additional bathroom graffiti and the banner graffiti were not specifically reported by McGinest. But in each case, McGinest alleges that the offensive markings appeared in areas used by, and accessible to, supervisory employees, which GTE does not dispute. Therefore, a reasonable factfinder could conclude that GTE "in the exercise of reasonable care should have known" of the existence of the graffiti. *Id.* (emphasis omitted). This is particularly true for graffiti that appeared after McGinest filed his complaint. Thus, I would conclude

that GTE may not claim lack of notice for any of McGinest's admissible allegations.

### 3

There remains one additional ground upon which GTE might succeed on summary judgment. Where, as here, there is evidence suggesting that a company had sufficient notice of discriminatory conduct, it generally may avoid liability if it adequately responded to the situation. *Fuller*, 47 F.3d at 1527. This may be so whether the offending employee is a coworker or a manager, although the burdens of proof differ. *See Swinton*, 270 F.3d at 803 (holding, in coworker harassment context, that plaintiff must prove "that the employer knew or should have known of the harassment but did not take adequate steps to address it"); *Nichols*, 256 F.3d at 877 (holding, in supervisor harassment context, that an employer can partially defend by proving that it "exercised reasonable care to prevent and correct promptly any ... harassing behavior").[11]

In considering adequacy, we examine a company's response in its ability to "stop harassment by the person who engaged in harassment." We must also consider whether that response might "persuade potential harassers to refrain from unlaw-

ful conduct." *Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir.1991).

In this case, GTE did formally respond to some of McGinest's complaints. And when GTE acted to address McGinest's specific allegations, discriminatory conduct from that particular employee appears to have ceased. For example, when GTE eventually learned the identity of a witness to Hughes's comments, it immediately reprimanded him, and there are no further allegations of misconduct against him. Likewise, when GTE spoke to DeLeon about the nicknames he used, DeLeon, too, ceased the offensive conduct. Finally, when McGinest complained to management about the bathroom graffiti, GTE promptly removed it.

Taken individually, GTE's responses might perhaps appear reasonable.[12] Indeed, there is no question that they worked to cease any additional actionable conduct by the offending employee. Nevertheless, despite GTE's efforts, opprobrious comments and behavior continued with some regularity from 1995 through 2000. And considering the totality of the circumstances, as we must, a reasonable factfinder could conclude that GTE's corrective measures were inadequate for failing "to impose sufficient penalties to assure a workplace free from ... harassment." *Id.*

---

**11.** In the supervisor context, a company must additionally demonstrate that an employee failed to take reasonable steps to pursue company remedies in order to avail itself of this defense. *See Nichols*, 256 F.3d at 877. For purposes of simplicity, however, I address only the "adequate response" question for each allegation.

**12.** One might dispute whether the two-year gap between Hughes's comments and GTE's response was reasonable. However, Hughes absolutely denied making any racist comments at all, and GTE was not provided with any witnesses to the event. And as soon as it learned the identity of a witness, GTE immediately acted to reprimand Hughes. *See, e.g.,*

*Holly D.*, 339 F.3d at 1178 (finding an adequate remedial measure where the defendant immediately responded to a harassment claim after a delay caused, in part, because the plaintiff "declined to provide [evidence] to the investigating committee"). Moreover, in the intervening period, there were no further specific allegations of discriminatory conduct by Hughes. Thus, when viewed within the confines of Hughes's conduct alone, GTE's response to the incident appears reasonable. I would note, however, that one of GTE's remedial requirements, that Hughes watch a tape concerning *sexual* harassment, seems quite puzzling.

In other words, the totality of the circumstances may suggest that the discriminatory conduct still occurred with sufficient frequency and severity such that GTE's remedies did not reasonably "persuade potential harassers to refrain from unlawful conduct." *Id.* This precludes summary judgment for GTE on these grounds. *Harris,* 510 U.S. at 23, 114 S.Ct. 367.

### C

Ultimately, my review of McGinest's admissible evidence, considering the totality of the circumstances, reveals a "close case" indeed. GTE made efforts to respond to McGinest's complaints, after which no one particular aggressor continued harassing McGinest. But considering the claim as a whole, McGinest's allegations present evidence of an overall work environment that may have been sufficiently hostile to trigger Title VII's protections.

Because I believe that we must exclude some of McGinest's allegations either as time barred or as merely conclusory, I am regrettably unable to concur in the majority's analysis. While I do agree that McGinest's claims may go forward, I must nonetheless dissent from the majority's unwillingness properly to examine the scope of that inquiry. The majority's opinion sets a dangerous precedent whereby plaintiffs who present a kitchen sink's worth of unsupported and time-barred allegations can survive summary judgment because "taken all together" they somehow mesh with each other so as to deny an

employer's efforts to avoid liability without a trial. Nevertheless, even upon a more soundly based analysis, triable issues of material fact remain in this case, and I therefore concur in the majority's decision to reverse the district court's summary judgment dismissal of the hostile work environment claim.

### II

McGinest also claims that GTE failed to promote him to the position of Outside Plant Construction Installer Supervisor on account of his race, a Title VII disparate treatment claim. *See* 42 U.S.C. § 2000e–2(a); *Jauregui v. City of Glendale,* 852 F.2d 1128, 1134 (9th Cir.1988) (describing disparate treatment as being "singled out and treated less favorably than others similarly situated on account of race" (internal quotation omitted)).

In support of this claim, McGinest invoked the familiar *McDonnell Douglas* presumption. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). I agree with the majority that the litigants appear somewhat confused about the use of the *McDonnell Douglas* presumption and how it relates to other evidence of discrimination. And because these burden-shifting issues are somewhat complicated, like the majority, I, too, engage in a complete analysis of the issue, but reach a different conclusion.[13]

---

**13.** I must admit that I find the majority's analysis somewhat confusing as well. It suggests that the method of analysis is "not particularly significant." Maj. Op. at 1123. To the extent the majority suggests that the *McDonnell Douglas* presumption does not provide McGinest with a significant advantage in this context, I disagree. Successful invocation of the presumption, and a subsequent failure of an employer to proffer an adequate, nondiscriminatory explanation, al-

lows a plaintiff to go to trial on less evidence than he or she otherwise could—which is why it is termed a "presumption." But to the extent the majority takes note of GTE's nondiscriminatory explanation and thus recognizes that the *McDonnell Douglas* presumption no longer attaches, I agree with the majority that issues pertaining specifically to the presumption then become "not particularly significant." *Id.*

## A

There is no question that McGinest is a member of a protected class, that he applied to and was qualified for the supervisor position, and that he was rejected from that position.

GTE disputes whether McGinest satisfied the fourth factor, "that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *Id.* at 802, 93 S.Ct. 1817. For, while a white supervisor received the job, GTE claims that because it was only a lateral transfer, the supervisor was not "treated more favorably." *Chuang v. Univ. of Cal., Davis Bd. of Trustees,* 225 F.3d 1115, 1123 (9th Cir.2000).

GTE takes an overly literal approach to the question. The Supreme Court in *McDonnell Douglas* itself indicated that the test must be practically applied. *McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. 1817. And here, GTE does not contest that McGinest qualified for a favorable promotion, and that the same job went to a white candidate instead. Therefore, I agree that McGinest successfully invoked the presumption.

GTE may rebut, however, by setting forth "some legitimate, nondiscriminatory reason for the challenged action." *Chuang,* 225 F.3d at 1123–24. GTE presented evidence that a "salary/hiring freeze" was in effect at the time, prohibiting outside hiring and internal promotions accompanied by increased pay. Salary and hiring freezes, of course, are common in the business world. On its face, then, this is a legitimate, nondiscriminatory reason for failing to promote McGinest. *See* Maj. Op. at 1123 (concluding that McGinest "must counter GTE's explanation that

a hiring freeze accounted for its failure to promote him"); *see also, e.g., Jones v. Fla. Power Corp.,* 825 F.2d 1488, 1492 (11th Cir.1987) (upholding factual finding that plaintiff's job denial "was not the result of racial discrimination but was justified due to a company hiring freeze"). Consequently, we are presented with an explanation that is "legally sufficient to justify a judgment for the defendant," *Tex. Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), so the *McDonnell Douglas* "presumption of discrimination drops out of the picture." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (internal quotation omitted).

## B

In the absence of the *McDonnell Douglas* presumption, McGinest's "burden now merges with the ultimate burden of persuading the court that [ ]he has been the victim of intentional discrimination. [H]e may succeed in this either [ (1) ] directly by persuading the court that a discriminatory reason more likely motivated the employer or [ (2) ] indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089. As to the first method, the majority correctly concludes that McGinest may present either direct or circumstantial evidence of discrimination, so long as it is sufficient to satisfy his ultimate burden. *See Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003).

### 1

McGinest offers two pieces of evidence directly to prove discrimination.[14] First,

---

**14.** McGinest actually suggests a third as well: that he was passed over for four other man-

agement positions in the past. However, he did not make this allegation before the district

he points to the offensive comments and other evidence that make up his hostile work environment claim. The majority specifically relies on this evidence—or at least on GTE's "permissive" response to it—to conclude that McGinest meets his burden. However, Ninth Circuit cases involving discriminatory failure to promote have always involved evidence of discrimination *among decisionmakers.* *See, e.g., Lam v. University of Hawaii,* 40 F.3d 1551 (9th Cir.1994) (finding evidence that professor who headed appointments committee was biased). Indeed, in the absence of additional evidence, "statements by nondecisionmakers, nor statements by decisionmakers unrelated to the decisional process itself, [cannot alone] suffice to satisfy the plaintiff's burden in this regard." *Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring); *see, e.g., DeHorney v. Bank of Am. Nat'l Trust & Sav. Ass'n,* 879 F.2d 459, 467 (9th Cir. 1989) (holding that the plaintiff failed to make out a prima facie case of race discrimination when there was no evidence to establish a nexus between the subordinate's racial slur and the superior's decision to terminate).

Here, the immediate decisionmaker, Begg, actually *recommended* hiring McGinest, and there are no allegations that he engaged in any discriminatory conduct either before, during, or after he declined to hire him. The salary/hiring freeze decision itself came from upper management, and evidence of harassment among co workers and supervisors at McGinest's yard simply does not establish discrimination extending to those higher levels. *See DeHorney,* 879 F.2d at 467. Neither has McGinest produced any other evidence connecting these decisionmakers to the discriminatory conduct of Hughes, Ledbet-

ter, and others, nor has he suggested that GTE's upper management intended to discriminate against him by instituting the freeze. There may be a triable issue of fact as to whether GTE's responses to the allegedly hostile work environment were insufficient for purposes of summary judgment. But this does nothing to establish that GTE upper management had any discriminatory *motive* for failing to promote McGinest.

Indeed, the evidence suggests the contrary in this case. GTE management responded to—and remedied—each individual instance of discrimination of which it formally became aware, including Hughes's comments, DeLeon's comments, and even Noson's behavior. While these responses may have been insufficient to rebut an overall hostile work environment claim, they certainly do not suggest that GTE management acted with any kind of discriminatory intent. Therefore, unlike the majority, I do not believe that McGinest may rely on his admissible evidence of a hostile work environment to bootstrap his disparate treatment claim.

Both McGinest and the majority also rely on evidence that GTE may have employed a disproportionately small number of African Americans. The majority accepts this allegation. Maj. Op. at 1124. But I, respectfully, cannot. First, there is no such statistical evidence in the record, even though McGinest presumably had an opportunity to develop it during discovery. Indeed, the district court denied McGinest's request at summary judgment to take judicial notice of such information. This ruling was clearly correct, as the information was both reasonably disputed by GTE and was not readily verifiable. Fed.R.Evid. 201(b). The district court further concluded that McGinest's statistics

court, and there is no evidence in the record

to support it. I therefore do not consider it.

were irrelevant because they were not accompanied by any analysis and because they involved a *different county* than where he actually worked. Such an evidentiary ruling is reviewed for abuse of discretion, of which I find none. *See Domingo v. T.K.*, 289 F.3d 600, 605 (9th Cir. 2002) (noting limited review "even when the rulings determine the outcome of a motion for summary judgment").

Moreover, this kind of data would shed little light on McGinest's disparate *treatment* claim because it says next to nothing about whether GTE used its neutrally applicable salary/hiring freeze in an effort to discriminate against him. Rather, it is more properly understood as evidence of disparate *impact*, tending to show that the effects of GTE's employment practice fell more harshly on him. *See Raytheon Co. v. Hernandez*, —— U.S. ——, ——, 124 S.Ct. 513, 519, 157 L.Ed.2d 357 (2003) ("This Court has consistently recognized a distinction between claims of discrimination based on disparate treatment and claims of discrimination based on disparate impact.").

Unfortunately, McGinest raised the issue of disparate impact for the first time on summary judgment, when he asked the court to take judicial notice of the statistics. Because McGinest failed to "plead the additional disparate impact theory in [his] complaint[ ], or ... to make known during discovery [his] intention to pursue recovery on the disparate impact theory," he may not now rely on it. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir.2001). In light of this failure, and because GTE has "offered a legitimate, non-discriminatory reason for its actions so

as to demonstrate that its actions were not motivated by[McGinest's race]," consideration of this evidence would require us to "stray[ ] from [our] task by considering not only discriminatory intent but also discriminatory impact." *Raytheon*, —— U.S. at ——, 124 S.Ct. at 521. This, the Supreme Court has told us we cannot do. *See id.*

### 2

Alternatively, McGinest attempts to meet his burden "indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089. McGinest first asks us to take judicial notice of reports of GTE's financial health around the time of the salary/hiring freeze. I agree with the majority that we must deny this motion, as these reports are not "capable of accurate and ready determination" as required by Fed.R.Evid. 201(b).[15]

McGinest is then left with a simple attack on the credibility of GTE's witnesses, arguing that the lack of *documentary* evidence of a freeze suggests that its explanation is "unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089. In reversing the district court, the majority, too, relies heavily on "the absence of any documentation confirming that a hiring freeze was in place during the relevant time period." Maj. Op. at 1123

This, of course, is not even evidence at all. *See Saint Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("It is not enough, in other words, to *dis*believe the employer. ..." (emphasis in original)). Rather, it is simply an attack on the *form* of the admissible evidence GTE submitted. It is

---

**15.** Moreover, such evidence would be inherently ambiguous in this context. Perhaps GTE's profit that year suggests that a salary/hiring freeze was unnecessary, and was instead a made-up justification for failing to promote McGinest. On the other hand, perhaps GTE made a profit that year precisely because it was fiscally conservative by, among other things, instituting a salary/hiring freeze.

axiomatic that adjudicators "must follow the same rules regarding documentary evidence as [those] regarding testimonial evidence." *Zahedi v. INS*, 222 F.3d 1157, 1165 (9th Cir.2000); *see also, e.g., Vera-Villegas v. INS*, 330 F.3d 1222, 1233 (9th Cir.2003) (holding that "documentary evidence is judged by the same credibility standards that apply to testimonial evidence").[16]

But the majority appears somehow to have transformed its disparagement of *GTE's* testimonial evidence into *McGinest's* "[p]roof" that is sufficient to carry his burden of persuasion. *See* Maj. Op. at 1124 (describing the testimonial nature of GTE's evidence as "[p]roof that the defendant's explanation is unworthy of credence" (internal quotation omitted)). This may be a neat trick, but it is directly contrary to Supreme Court precedent, for it clearly "disregards the fundamental principle ... that a presumption does not shift the burden of proof, and ignores [the Supreme Court's] repeated admonition that the Title VII plaintiff at all times bears the ultimate burden of persuasion." *Hicks*, 509 U.S. at 511, 113 S.Ct. 2742 (internal quotation omitted).

Indeed, the majority's rejection of GTE's explanation can only be described as an independent credibility determination.[17] But again, direct Supreme Court authority stands in the way. Because GTE's burden of submitting a neutral hiring justification "is one of production, not persuasion[,] it 'can involve no credibility assessment.' " *Reeves*, 530 U.S. at 142, 120 S.Ct. 2097 (quoting *Hicks*, 509 U.S. at 509, 113 S.Ct. 2742). Neither McGinest

nor the majority may simply cast aspersions on GTE's non-discriminatory explanation. *Id.* Rather, McGinest must present *evidence* that it is untrue, and this he has not done.

Even if an examination of GTE's "trustworthiness" were proper, I would find no fault. Two GTE employees, Begg and Nakamura, testified that they had direct knowledge of the freeze, while two other employees, Brand and Valle, were familiar with it. Corroborating this testimony is the undisputed fact that the man hired in McGinest's place did *not* receive a promotion or a pay increase. McGinest was unwilling or unable even to produce evidence, circumstantial or otherwise, that GTE hired or promoted anyone else during the relevant time period.

3

Once the *McDonnell Douglas* presumption vanished in the face of GTE's neutral hiring justification, McGinest failed to produce any admissible, relevant evidence of a discriminatory failure to promote him. Neither did he present any *evidence* suggesting that GTE's neutral explanation was "unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089. Therefore, I must respectfully dissent from the majority's decision to reverse the district court's dismissal of this claim.

III

Finally, McGinest also brings suit for retaliatory failure to promote. *See* 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer

---

**16.** Both of these cases happen to concern treatment of evidence by Immigration Judges. I would assert as indisputable that the same principles apply when *any* judge, including an appellate judge, examines evidence.

**17.** With respect, I am particularly surprised that the majority would weigh the credibility

of GTE's hiring-justification evidence in light of its own admonition that a "court is not empowered to make credibility determinations" at summary judgment. Maj. Op. at 1113 n. 5.

to discriminate against any of [its] employees ... because he has opposed any [discriminatory] practice."). I agree with the majority's reasoning and conclusion that we must uphold the district court's dismissal of this claim.

## IV

In conclusion, I agree that we must reverse on the hostile work environment claim, but for reasons different from the majority. I respectfully disagree with the majority on the disparate treatment claim, and would affirm. Finally, I concur in the court's decision to affirm summary judgment dismissal on the retaliatory failure to promote claim.